# In the United States Court of Federal Claims

No. 17-1796C
**Filed: June 11, 2019**

```
* * * * * * * * * * * * * * * * *
                                  *
SAN ANTONIO HOUSING              *
AUTHORITY,                        *
                                  *
                Plaintiff,        *
                                  *
v.                                *
                                  *
UNITED STATES,                    *
                                  *
                Defendant.        *
                                  *
* * * * * * * * * * * * * * * * *
```

**Motion to Dismiss; Breach of Contract; Monetary Damages; Equitable Relief; Sections 8 and 9 of the 1937 Housing Act; Appropriations; Moving to Work Demonstration Program.**

**Stephen T. Dennis**, Clark Hill Strasburger, San Antonio, TX, for plaintiff. With him was **Katie Anderson**, Clark Hill Strasburger, San Antonio, TX.

**Isaac B. Rosenberg**, Trial Attorney, Commercial Litigation Branch, Civil Division, Unites States Department of Justice, Washington, D.C., for defendant. With him were **Franklin E. White, Jr.**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joseph H. Hunt**, Assistant Attorney General. Of counsel were **David M. Reizes**, Assistant General Counsel for Assisted Housing and Civil Rights Litigation, Office of General Counsel, United States Department of Housing and Urban Development, Washington, D.C, and **Kyle E. Helmick**, Attorney Advisor, Office of General Counsel, United States Department of Housing & Urban Development.

## O P I N I O N

<u>**HORN, J.**</u>

Plaintiff San Antonio Housing Authority (SAHA) is a public housing agency based in San Antonio, Texas, which receives "Section 8" funding for housing rental assistance and "Section 9" subsidies for its operation costs and capital and management activities from the United States Department of Housing and Urban Development (HUD) pursuant to Section 8 and Section 9 of the United States Housing Act of 1937. See Pub. L. No. 75-412, 50 Stat. 888 (1937) (codified as amended at 42 U.S.C. § 1437 et seq. (2018)) (1937 Housing Act). Plaintiff also participates in the federal housing program titled "Moving to Work" (MTW demonstration program), which allows public housing agencies to use various sources of federal public house funding, including Section 8 funding and Section 9 subsidies, interchangeably with other grant-in-aid funds.

In 2012, HUD decided to reduce all public housing agencies' Section 9 funding with public housing agencies' operating reserves, which were excess operating funds held by the public housing agency. As both parties agree, HUD, however, did not uniformly reduce public housing agencies' Section 9 funding in 2012. For public housing agencies not participating in the MTW demonstration program (non-MTW agencies), HUD calculated each of the non-MTW agencies' operating reserve amounts and then reduced each of the non-MTW agencies' Section 9 operating subsidy for 2012 with the non-MTW agencies' actual operating reserve level. Allegedly due to an inability to calculate the amount of operating reserve levels for public housing agencies participating in the MTW demonstration program (MTW agencies), HUD did not individually assess the operating reserve levels for each of the MTW agencies. Instead, HUD offset MTW agencies' Section 9 operating subsidy with the average, pro-rata percentage of the reduction of the Section 9 operating subsidy applied to the MTW agency's peer group, a group of similarly sized non-MTW agencies.

The above-captioned case does not arise from the government's decision just to reduce Section 9 funding with public housing agencies' operating reserve levels, but, instead, from the government's allegedly unequal application of the Section 9 funding offset between non-MTW agencies and MTW agencies. Plaintiff alleges that the government discriminated against MTW agencies, including plaintiff, when the government reduced MTW agencies' Section 9 funding by a pro-rata average reduction based on MTW agencies' peer group of non-MTW agencies.

Plaintiff has filed suit in this court, alleging three counts seeking to recover a damages award of $2,874,719.00 for the government's alleged decision to unequally offset plaintiff's Section 9 operating funding for 2012. Count I alleges that the government breached a contract with plaintiff, which the parties in this case, at times, refer to as the "MTW Agreement," in which the government promised not to discriminate against plaintiff based on plaintiff's participation in the MTW demonstration program. Count II alleges that the government violated the Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1996, Pub. L. No. 104-134, § 204, 110 Stat. 1321, 1321-281 (1996) (MTW Statute), which created and authorized the MTW demonstration program and which prohibits the government from diminishing an MTW agency's Section 9 funding based on the MTW agency's decision to participate in the MTW demonstration program. Count III alleges that the government violated the Consolidated and Continuing Appropriations Act of 2012, Pub. L. No. 112-55, 125 Stat. 552 (2011) (2012 Appropriations Act), which appropriated monies for HUD's Section 9 operating subsidies for 2012 and which required defendant to consider the operating reserves available to MTW and Non-MTW agencies when determining a potential offset for Section 9 funding. See 2012 Appropriations Act, 125 Stat. at 680.

Currently pending before the court is a motion to dismiss the above-captioned case filed by defendant, the United States, for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) (2018). According to defendant, plaintiff's three "claims are not based upon any money-

2

mandating source of law." In the alternative, defendant has moved to dismiss plaintiff's three count complaint for failure to state a claim, pursuant to RCFC 12(b)(6).

## FINDINGS OF FACT

The Relevant HUD Programs

Pursuant to the 1937 Housing Act, HUD provides federal funding at the State and local level to promote affordable housing for low-income individuals. See 42 U.S.C. § 1437(a) (2018). HUD administers the funding to public housing agencies, which are "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing, or a consortium of such entities or bodies as approved by the Secretary" of HUD. Id. at § 1437a(b)(6)(a) (2018). The public housing agencies, in turn, provide local affordable housing to individual tenants. Two of the federal housing programs relevant to the above-captioned case are "Section 8" rental assistance payments and "Section 9" operating and capital subsidies.

Section 8 of the 1937 Housing Act, currently codified at 42 U.S.C. § 1437f (2018), states that, "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing housing in accordance with the provisions of this section." Id. at § 1437f(a). The Secretary of HUD "is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units." Id. at § 1437f(b)(1). The Secretary of HUD also is "authorized to enter into annual contributions contracts with public housing agencies for the purpose of replacing public housing." Id. at § 1437f(b)(2).

Another feature of Section 8 is the "Voucher program," which states that "[t]he Secretary may provide assistance to public housing agencies for tenant-based assistance . . . ." Id. at § 1437f(o)(1)(A). The monthly assistance payment under the Voucher program

> shall be equal to the amount by which the rent (including the amount allowed for tenant-paid utilities) exceeds the greatest of the following amounts, rounded to the nearest dollar:
> (i)     30 percent of the monthly adjusted income of the family.
> (ii)    10 percent of the monthly income of the family.
> (iii)   If the family is receiving payments for welfare assistance from a public agency and a part of those payments, adjusted in accordance with the actual housing costs of the family, is specifically designated by that agency to meet the housing costs of the family, the portion of those payments that is so designated.

Id. at § 1437f(o)(2)(A).

Section 9 of the 1937 Housing Act, currently codified at 42 U.S.C. § 1437g (2018), provides subsidies for public housing agencies to help cover their operational and capital activities. See 42 U.S.C. § 1437g(d)-(e). Unlike with Section 8 assistance, the law requires that the Secretary of HUD allocate Section 9 funding into a "Capital Fund" and an "Operating Fund," from which HUD makes the subsidy payments to qualifying public housing agencies. Id. at § 1437g(c)(1) ("For fiscal year 2000 and each fiscal year thereafter, the Secretary shall allocate amounts in the Capital Fund and Operating Funds [sic] for assistance for public housing agencies eligible for such assistance." (footnote omitted)). Regarding the "Capital Fund," Section 9 states that "[t]he Secretary shall establish a Capital Fund for the purpose of making assistance available to public housing agencies to carry out capital and management activities," which include such tasks as "the development, financing, and modernization of public housing projects," "vacancy reduction," "addressing deferred maintenance needs and the replacement of obsolete utility systems and dwelling equipment." Id. at § 1437g(d)(1).

Regarding the "Operating Fund," Section 9 states that "[t]he Secretary shall establish an Operating Fund for the purpose of making assistance available to public housing agencies for the operation and management of public housing," which includes activities such as "procedures and systems to maintain and ensure the efficient management and operation of public housing units," "activities to ensure a program of routine preventative maintenance," and "anticrime and antidrug activities, including the costs of providing adequate security for public housing residents." Id. at § 1437g(e)(1). Section 9 also provides HUD with the "Right of recapture" of Section 9 funding. See id. at § 1437g(j)(6). Pursuant to Section 9, "[a]ny obligation entered into by a public housing agency shall be subject to the right of the Secretary to recapture the obligated amounts for violation by the public housing agency of the requirements of this subsection," which includes the requirements that (1) a public housing agency "obligate" Section 9 funds within "24 months" after receiving the funds, and (2) a public housing agency "spend any assistance received under this section not later than 4 years . . . after the date on which funds become available to the agency for obligation." Id.

The amount of payment a public housing agency receives from the Capital Fund and Operating Fund is determined by the Secretary of HUD. See id. at § 1437g(d)(2)(A), (e)(2)(A). For both the Capital Fund and Operating Fund, the "Secretary shall establish a formula for determining the amount of assistance provided to public housing agencies" from each fund on a yearly basis. Id. at § 1437g(d)(2). The applicable Section 9 operating subsidy formula established by the Secretary of HUD, currently codified at 24 C.F.R. § 990.110 (2018), calculates, on an individual project[1] level basis, the difference between

---

[1] A "project" is defined as a "public housing building or set of buildings grouped for the purpose of management" and a public housing agency's operating subsidy eligibility is determined for each individual project. See 24 C.F.R. § 990.265 (2018); see also 24 C.F.R. § 990.160 (2018).

the public housing agency's estimated non-operating subsidy revenue and estimated operating expenses. See 24 C.F.R. § 990.110(a)(2). Public housing agencies are eligible for an operating subsidy when the estimated project operating expense is greater than the estimated non-operating subsidy revenue for the year. See id. If HUD, however, does not have sufficient funds to pay the full amount of Section 9 operating subsidies due to public housing agencies, "HUD shall have discretion to revise, on a pro rata basis, the amounts of operating subsidy to be paid to PHAs [public housing agencies]." 24 C.F.R. § 990.210 (2018). HUD's regulations also note that the amount of "[o]perating subsidy payments will be limited to the availability of funds as described in § 990.201(c)." 24 C.F.R. § 990.110(b)(3). As plaintiff notes in its response to defendant's motion to dismiss, "[a]nnual Congressional appropriations for operating subsidies have generally been less than the subsidy amounts produced by the formulas," and that, "[w]hen this occurs, the operating subsidy for each PHA is reduced by HUD on a pro-rata basis." (citing 24 C.F.R. § 990.210(c)).

To convey Section 8 and Section 9 funding to public housing agencies, HUD uses annual contribution contracts, which are contracts that public housing agencies and HUD are required to enter into on an annual basis by law. See 42 U.S.C. § 1437c(a)(1) ("The Secretary may make annual contributions to public housing agencies to assist in achieving and maintaining the lower income character of their projects. The Secretary shall embody the provisions for such annual contributions in a contract guaranteeing their payment."); see also 42 U.S.C. §§ 1437d(a)-(b), 1437f(b). As defined by federal regulation, "[a]nnual contributions contract (ACC) is a contract prescribed by HUD for loans and contributions, which may be in the form of operating subsidy, whereby HUD agrees to provide financial assistance and the PHA agrees to comply with HUD requirements for the development and operation of its public housing projects." 24 C.F.R. § 990.115 (2018).

The MTW Demonstration Program

In 1996, as part of that year's appropriation act for HUD, Congress authorized the "MTW demonstration program." See MTW Statute § 204(a). A substantive law, which authorizes the Executive Branch to create programs, normally precedes an appropriation act. See A Glossary of Terms Used in the Federal Budget Process, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, 15, https://www.gao.gov/products/GAO-05-734SP (last visited June 11, 2019) (GAO Glossary) (noting that "Authorizing Legislation" "establishes and continues the operation of a federal program or agency either indefinitely or for a specific period or that sanctions a particular type of obligation or expenditure within a program" and noting that "[t]his term is used in two different ways: (1) to describe legislation enacting new program authority, that is, authorizing the program, and (2) to describe legislation authorizing an appropriation").[2] An "appropriation act" is a law that

---

[2] As the United States Court of Appeals for the Federal Circuit explained in Thompson v. Cherokee Nation of Oklahoma, 334 F.3d 1075 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003), aff'd, 543 U.S. 631 (2005), "[s]everal fundamental principles of appropriations law, as enunciated by the Supreme Court, by this court, by our

provides funding to support authorization laws. <u>See</u> <u>Schism v. United States</u>, 316 F.3d 1259, 1266 n.7 (Fed. Cir. 2002) ("An authorization act is passed every year by both chambers of Congress. In this act, the Congress enumerates, or 'authorizes,' the activities that may be carried-out by each department. (Other activities may be authorized by permanent legislation.) An appropriations bill, on the other hand, explicitly provides the amount of funding each such activity will receive for that Fiscal Year."); <u>see</u> <u>also</u> <u>GAO Glossary</u> at 13 (defining "Appropriation Act" as "[a] statute" that "generally provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes" and noting that "an appropriation act should follow enactment of authorizing legislation"). At times, Congress authorizes programs within an appropriation statute, as Congress did with the MTW demonstration program in 1996.

Pursuant to the MTW Statute, the "PURPOSE" of the MTW demonstration program is to

give public housing agencies and the Secretary of Housing and Urban Development the flexibility to design and test various approaches for providing and administering housing assistance that: reduce cost and achieve greater cost effectiveness in Federal expenditures; give incentives to families with children where the head of household is working, seeking work, or is preparing for work by participating in job training, educational programs, or programs that assist people to obtain employment and become economically self-sufficient; and increase housing choices for low-income families.

---

predecessor court, and by other circuits" have "relied on the opinions of the General Accounting Office [subsequently renamed the Government Accountability Office] ('GAO'), as expressed in *Principles of Federal Appropriations Law* ('*GAO Redbook*'), and on the opinions of the Comptroller General, both of whose opinions, while not binding, are 'expert opinion[s], which we should prudently consider.'" <u>Thompson v. Cherokee Nation of Okla.</u>, 334 F.3d at 1084 (emphasis in original) (quoting <u>Delta Data Sys. Corp. v. Webster</u>, 744 F.2d 197, 201 (D.C. Cir. 1984)); <u>see also</u> <u>Star-Glo Assocs., LP v. United States</u>, 414 F.3d 1349, 1354 (Fed. Cir.), <u>reh'g</u> <u>and reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2005). Thus, for purposes of this Opinion, this court will refer to the most recent edition of the GAO Redbook, as well as the GAO Glossary, the GAO's online publication of "standard terms, definitions, and classifications for the government's fiscal, budget, and program information." <u>See</u> <u>GAO Glossary</u>, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, https://www.gao.gov/products/GAO-05-734SP (last visited June 11, 2019). Because the GAO is in the process of updating the GAO Redbook, the 4th and latest edition of the GAO Redbook, published in 2016, is currently only available for Chapters 1 through 3, while the 3rd edition, published in 2004, remains the most currently available edition for Chapters 5 through 15, the remaining chapters of the GAO Redbook. <u>See</u> THE RED BOOK, https://www.gao.gov/legal/appropriations-law-decisions/red-book (last visited June 11, 2019).

MTW Statute § 204(a) (capitalization in original).  The MTW Statute further provides that, unlike non-MTW agencies, MTW agencies

> may combine operating assistance provided under section 9 of the United States Housing Act of 1937, modernization assistance provided under section 14 of such Act, and assistance provided under section 8 of such Act for the certificate and voucher programs, to provide housing assistance for low-income families, as defined in section 3(b)(2) of the United States Housing Act of 1937, and services to facilitate the transition to work on such terms and conditions as the agency may propose and the Secretary may approve.

Id. at § 204(b).

Section (f) of MTW Statute, the provision at issue in Count II of the complaint and which plaintiff alleges defendant violated when it reduced its Section 9 operating subsidy in 2012, states that "[t]he amount of assistance received under section 8, section 9, or pursuant to section 14 [of the United States Housing Act of 1937] by a public housing agency participating in the [MTW] demonstration under this part shall not be diminished by its participation." Id. at § 204(f). Defendant refers to Section (f) as the "undiminished assistance provision" in its motion to dismiss, while plaintiff refers to Section (f) in its complaint as the "Anti-Discrimination Provision."

Beginning in 2008, HUD entered into standardized "MTW agreements" with each participating public housing agency. See Hous. Auth. of City of New Haven v. United States, 140 Fed. Cl. 773, 778 (2018) (noting that a public housing authority which participates in the MTW demonstration program "must execute a standard MTW agreement memorializing the terms of its participation in the program"); see also Moving to Work Standard Agreement, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, https://www.hud.gov/program_offices/public_indian_housing/programs/ph/mtw/mtwsa (last visited June 11, 2019) (noting that each public housing agency participating in the MTW demonstration program entered into a "MTW Standard Agreement" beginning in 2008). Before 2008, each participating public housing agency in the MTW demonstration program "had a unique Agreement with HUD regarding the conditions of its participation and exceptions to statute and regulation." Moving to Work Standard Agreement, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, https://www.hud.gov/program_offices/public_indian_housing/programs/ph/mtw/mtwsa (last visited June 11, 2019).

Plaintiff's 2009 MTW Agreement with HUD

On June 25, 2009, after HUD made the switch to using standardized MTW agreements program wide, plaintiff and HUD entered into a standardized MTW agreement (2009 MTW Agreement). The 2009 MTW Agreement is the agreement that plaintiff alleges defendant breached in 2012, when defendant allegedly, wrongfully diminished plaintiff's Section 9 operating subsidy due to plaintiff's participation in the

MTW demonstration program. Plaintiff's 2009 MTW Agreement, which was signed by plaintiff's President and CEO and by an Assistant Secretary of HUD, memorialized various "mutual representations and obligations" agreed to by plaintiff and HUD.

Section I of the 2009 MTW Agreement, titled "Statutory Authorizations," states that it "waives certain provisions of the United States Housing Act of 1937, as amended (1937 Act), and HUD's implementing requirements and regulations thereunder," only "to the extent they are necessary to implement the Agency's Annual MTW Plan." According to Attachment B to plaintiff's 2009 MTW Agreement, entitled "Form 50900: Elements for the Annual MTW Plan and Annual MTW Report," and which was attached to plaintiff's complaint in the above-captioned case, an agency's Annual MTW Plan outlines an MTW agency's general operating information, proposed MTW activities, approved and ongoing MTW activities, and sources and uses of MTW funds. (capitalization in original).

Section I of the 2009 MTW Agreement also requires plaintiff to comply with certain provisions under the 1937 Housing Act and states:

> [T]he following provisions of the 1937 Act, as otherwise applicable, shall continue to apply to the Agency and/or assistance received pursuant to the 1937 Act:
>
> > 1. The terms "low-income families" and "very low-income families" shall continue to be defined by reference to Section 3(b)(2) of the 1937 Act (42 U.S.C. § 1437a(b)(2));
> > 2. Section 12 of the 1937 Act (42 U.S.C. § 1437j), as amended, shall apply to housing assisted under the demonstration, other than housing assisted solely due to occupancy by families receiving tenant-based assistance; and
> > 3. Section 18 of the 1937 Act (42 U.S.C. § 1437p, as amended by Section 1002(d) of Public Law 104-19, Section 201(b)(1) of Public Law 104-134, and Section 201(b) of Public Law 104-202), governing demolition and disposition, shall continue to apply to public housing notwithstanding any use of the housing under MTW.

Section I further states that "[o]ther federal, state and local requirements applicable to public housing shall continue to apply notwithstanding any term contained in this" agreement, including "but are not limited to," "Appropriations Acts, competitive HUD notices of funding availability under which the Agency has received an award, state and local laws, Federal statutes other than the 1937 Act, and OMB Circulars and requirements."

Section II.A of plaintiff's 2009 MTW Agreement, which largely tracks the language of Section (f) of the MTW Statute, states that, "[t]he amount of assistance received under sections 8 or 9 of the 1937 Act by an Agency participating in the demonstration shall not

be diminished by the Agency's participation in the MTW demonstration." Also, like the MTW Statute, the 2009 MTW Agreement states that plaintiff could "combine" Section 8 and Section 9 funds, which the 2009 MTW Agreement referred to as "MTW Funds," in order to provide "flexibility" in carrying out the MTW demonstration program.

The 2009 MTW Agreement includes a "Funding" section, which states that "HUD will provide the Agency with public housing operating subsidies, and modernization or capital funds (including development and replacement housing factor funds), and with tenant-based Section 8 assistance, as provided in Attachment A." Attachment A provides that, "[u]pon execution of the Moving to Work (MTW) Agreement (MTW Agreement) between the U.S. Department of Housing and Urban Development (HUD) and the San Antonio Housing Authority (Agency), HUD will provide the Agency with operating subsidy, capital funds and Housing Choice Voucher Program assistance as described below." Attachment A explains that "[t]he calculation of operating subsidy will continue in accordance with applicable operating subsidy formula law and regulations."

As previously noted, the "applicable operating subsidy formula law and regulations" calculate, on an individual project level basis, the difference between the public housing agency's estimated non-operating subsidy revenue and estimated operating expenses. See 24 C.F.R. § 990.110(a)(2). Public housing agencies are eligible for an operating subsidy when the estimated project operating expense is greater than the estimated non-operating subsidy revenue for the year. See id. If HUD, however, does not have sufficient funds to pay the full amount of a public housing agency's annual operating subsidy, "HUD shall have discretion to revise, on a pro rata basis, the amounts of operating subsidy to be paid to PHAs." 24 C.F.R. § 990.210.

HUD's 2011 Notice Regarding Operating Fund Subsidies for 2012

On September 26, 2011, HUD issued "Notice PIH [Public and Indian Housing] 2011-055" to all public housing agencies regarding HUD's calculation of operating subsidies for the 2012 and explained that Congress may require operating subsidies for 2012 to be offset by a public housing agency's "operating reserves." The 2011 Notice explained that "[t]he President's 2012 budget contains language that if included in the HUD 2012 Appropriations Act would require HUD to take into account PHA operating reserves in the calculation of PHA operating subsidy," also known as a "'Subsidy Allocation Adjustment.'" "Operating reserves," as explained in the 2011 Notice,

> means the amount of current assets that are available after liquidating any liability that is due within the next year (current liability). . . . For most PHAs operating reserves is the accumulation of funds that includes but is not limited to:
>
> - unspent operating subsidy, including ARF;
> - unspent tenant rent;
> - other miscellaneous revenue, including program income that has expanded uses (e.g., non-rental income from

vending machines, cell tower leases, energy savings from
energy performance contracts); and

- unrestricted, unspent insurance proceeds (i.e., when
insurance proceeds are in excess of the actual cost to
repair the property or the PHA received written HUD
approval to retain the insurance proceeds in lieu of
repairing the units and the property is approved by HUD
for demolition or disposition).

The 2011 Notice also noted that:

Although this adjustment has not yet been enacted by Congress, HUD is
providing PHAs with this information and the procedures for implementation
so that PHAs are able to plan accordingly. . . . [A]ny allocation adjustment
to the operating subsidy is subject to the language in the FFY 2012
Appropriations Act.

The 2011 Notice also indicated how HUD would calculate the operating subsidy
allocation adjustment for 2012 if Congress decided to offset operating subsidies with a
public housing agency's operating reserves. Notably, the 2011 Notice explained that
HUD's calculation of the subsidy allocation adjustment would differ between MTW
agencies and non-MTW agencies. For non-MTW agencies, the 2011 Notice indicated that
HUD's subsidy allocation adjustment would take into account a public housing agency's
operating reserves. If a public housing agency had reserves in excess of a certain
required minimum level of operating expenses, which was four or six months of operating
expenses, depending on a public housing agency's size, the excess reserves would offset
a portion of the public housing agency's operating subsidy. If a public housing agency did
not have any excess reserves, the public housing agency's operating subsidy would not
be reduced. Contrastingly, for MTW agencies, according to the 2011 Notice, regardless
of whether a MTW agency had excess reserves, a MTW agency's operation subsidy
would be reduced by a set percentage "based on the average reduction" of the MTW
agency's "peer group." A peer group, according to plaintiff's complaint, "refers to similarly-
sized public housing agencies."

Federal Funding for Section 9 Operating Subsidies for 2012

On November 18, 2011, Congress enacted the 2012 Appropriations Act, which
appropriated monies for HUD's operating subsidies for 2012. See 2012 Appropriations
Act, 125 Stat. at 680. According to the 2012 Appropriations Act:

For 2012 payments to public housing agencies for the operation and
management of public housing, as authorized by section 9(e) of the United
States Housing Act of 1937 (42 U.S.C. [§] 1437g(e)), $3,961,850,000, of
which $20,000,000 shall be available until September 30, 2013: *Provided*,
That in determining public housing agencies', including Moving to Work
agencies', calendar year 2012 funding allocations under this heading, the

10

Secretary shall take into account public housing agencies' excess operating fund reserves, as determined by the Secretary: *Provided further*, That Moving to Work agencies shall receive a pro-rata reduction consistent with their peer groups: *Provided further*, That no public housing agency shall be left with less than $100,000 in operating reserves . . . .

Id. (emphasis in original).

When calculating the amount of Section 9 funding public housing agencies were to receive in 2012, HUD did not take into account individual MTW agencies' excess operating reserve levels. According to HUD's "2012 Operating Subsidy Allocation Adjustment Implementation Plan Congressional Report," which HUD submitted on December 16, 2011 to Senator Daniel K. Inouye, Chairman of the Committee on Appropriations of the United States Senate, and which also was attached to defendant's motion to dismiss, HUD was "unable to determine reserve balances for agencies that participate in the Moving-to-Work (MTW) program given the flexibility MTW agencies have to combine program funds between both their Section 8 Tenant Based Rental Assistance program and Section 9 Public Housing funds." Thus, as HUD's report states, and as both parties in the above-captioned case agree, HUD reduced MTW agencies' Section 9 operating subsidies by the average percentage reduction in the operating subsidy of the MTW agencies' applicable peer group.

In plaintiff's case, the amount of the Section 9 operating subsidy plaintiff needed to cover its operating expenses for 2012, was, according to HUD's 2012 operating subsidy spreadsheet, $23,643,309.00. HUD first reduced this amount by "12.8%," or $3,027,298.00, which was the average operating subsidy reduction of plaintiff's peer group, resulting in a net 2012 operating subsidy amount of $20,616,011.00. HUD then reduced plaintiff's operating subsidy a second time, by applying a "prorated factor of 94.96%," which HUD uniformly applied to all non-MTW and MTW agencies,  due to a lack of sufficiently appropriated monies by Congress to fully fund the Section 9 program for 2012. In other words, plaintiff only received 94.96% of $20,616,011.00, resulting in a final 2012 operating subsidy amount of $19,576,970.00 Plaintiff in the above-captioned case does not challenge HUD's decision to apply a prorated factor of 94.96% to its Section 9 operating subsidy, which was uniformly applied to MTW and non-MTW agencies. Plaintiff, instead, challenges HUD's decision to first reduce plaintiff's Section 9 operating subsidy by 12.8%, the average reduction a MTW's peer group of non-MTW agencies. According to plaintiff, San Antonio Housing Authority had no operating reserve levels for 2012, and, thus, its Section 9 operating subsidy only should have been offset by the prorated factor of 94.96%.

Following HUD's decision to offset a MTW agency's Section 9 operating subsidy in 2012, at least one public housing agency, besides the plaintiff in the above-captioned case, has brought suit in the United States Court of Federal Claims, alleging that the government breached its MTW agreement and the 2012 Appropriations Act when the government allegedly unequally reduced its Section 9 operating subsidy in comparison to non-MTW agencies.  See Hous. Auth. of City of New Haven v. United States, 140 Fed.

Cl. at 775. The <u>Housing Authority of City of New Haven</u> plaintiff, however, did not bring an additional claim pursuant to Section (f) of the MTW Statute, as does the plaintiff in this case. In the <u>Housing Authority of City of New Haven</u> case, the Judge found that the court had jurisdiction over the public housing agency's breach of contract claim, but dismissed the other two counts of the complaint, which alleged two separate violations of the 2012 Appropriations Act, for lack of subject matter jurisdiction. <u>See id.</u> at 791. As of the date of this Opinion, the <u>Housing Authority of City of New Haven</u> case is currently ongoing.

## PROCEDURAL HISTORY

On November 15, 2017, plaintiff filed its three count complaint in the above-captioned case, alleging that HUD wrongfully diminished plaintiff's 2012 operating subsidy "solely because" plaintiff "is a MTW agency." As previously discussed, plaintiff was eligible for a 2012 operating subsidy in the amount of $23,643,309.00, which was reduced by 12.8%, the average operating subsidy reduction for plaintiff's peer group, resulting in a net operating subsidy of $20,616,011.00. Plaintiff's net amount was further reduced by HUD's decision to apply a proration factor of 94.96%, which HUD applied uniformly to MTW and non-MTW agencies, resulting in a final 2012 operating subsidy amount of $19,576,970.00. Plaintiff's complaint does not challenge HUD's decision to apply a proration factor of 94.96%. Instead, plaintiff challenges HUD's decision to first decrease plaintiff's operating subsidy amount of $23,643,309.00 by 12.8% allegedly due to plaintiff's participation in the MTW demonstration program. According to plaintiff's complaint, plaintiff had "**zero** excess reserves" for 2012 and, thus, if it had been treated like non-MTW agencies, for which HUD took into account their actual operating reserve level, plaintiff's 2012 operating subsidy would not have been reduced by 12.8%. (emphasis in original). According to plaintiff, its Section 9 operating subsidy amount should have only been reduced once, by the 94.96% proration factor, resulting in a Section 9 subsidy amount of $22,451,686.00. Plaintiff now seeks to recover $2,874,719.00, the difference between $22,451,686.00, the amount of the Section 9 operating subsidy plaintiff alleges it should have received in 2012, and $19,576,970.00, the amount of the Section 9 operating subsidy plaintiff received in 2012.

Plaintiff's complaint asserts three counts, each seeking damages in the amount of $2,874,719.00. Count I alleges that HUD "breached the Anti-Discrimination Provision in Section II.A of the MTW Agreement by reducing SAHA's [San Antonio Housing Authority's] operating subsidy" "solely because SAHA is a MTW agency (specifically through HUD's policy requiring reduction of the operating subsidies of MTW agencies, regardless of whether the agency had excess reserves, while considering the existence of excess reserves in making the same determination for non-MTW agencies)." According to Count I, "[a]s a result of HUD's breach of the MTW Agreement, SAHA was damaged in the amount of at least $2,874,719 and is entitled to recover [sic] same."

Count II alleges that HUD "violated Section (f)" of the MTW Statute, which, according to plaintiff, "prohibits the reduction of a MTW agency's operating subsidy on the basis of the agency's participation in the MTW program." Plaintiff alleges that "by reducing SAHA's operating subsidy . . . solely because SAHA is a MTW agency,"

defendant violated Section (f) of the MTW Statute and that plaintiff "was damaged in the amount of at least $2,874,719.00 and is entitled to recover [sic] same."

Count III alleges that HUD "violated" the "2012 Appropriations Act," "by reducing SAHA's operating subsidy . . . solely because SAHA is a MTW agency." According to Count III, the 2012 Appropriations Act "requires HUD to consider the excess operating fund reserves of public housing agencies," including "MTW agencies, when making 2012 funding allocations." Count III alleges that, "[a]s a result of HUD's violation of the 2012 Appropriations Act, SAHA was damaged in the amount of at least $2,874,719.00 and is entitled to recover [sic] same."

Defendant filed a motion to dismiss pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction, alleging that "SAHA's claims are not based upon any money-mandating source of law," and, therefore, the complaint is outside this court's jurisdiction under the Tucker Act. Defendant, in the alternative, seeks to dismiss plaintiff's complaint pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief may be granted. Defendant argues: "[B]ecause SAHA seeks relief to which it is not entitled under the MTW Statute, the 2012 Appropriations Act, or its MTW agreement [2009 MTW Agreement]— namely, a naked money judgement with no strings attached—SAHA likewise has failed to state a claim upon which relief can be granted."

Plaintiff filed a response to defendant's motion to dismiss, arguing that each of its three counts invoke a money-mandating source of law, and, therefore, this court has subject matter jurisdiction over its complaint. Additionally, plaintiff argues each of its three counts present a "plausible claim for compensatory monetary damages," and, thus, survive defendant's motion to dismiss for failure to state a claim. In the alternative, plaintiff requests that, "[i]n the event this Court finds that jurisdiction is lacking over all or part of SAHA's claims under the Tucker Act," this court, "in the interest of justice," should "transfer this case to the United States District Court for the Western District of Texas, San Antonio Division, under the Transfer Statute, 28 U.S.C. § 1631."

Defendant filed its reply in support of its motion to dismiss, reiterating that this court lacks subject matter jurisdiction over plaintiff's complaint and that plaintiff's complaint fails to state a claim. Defendant also argues that transferring plaintiff's case to any district court "is not appropriate" because plaintiff's complaint may potentially be time-barred by the six-year statute of limitations contained in 28 U.S.C. § 2401(a) (2018), which, according to defendant, "'provides that every civil action against the United States is barred unless brought within six years of accrual.'" (quoting Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv., 112 F.3d 1283, 1286 (5th Cir. 1997)). Defendant also argues that transfer is inappropriate given the "'weakness of plaintiff's case on the merits.'" (quoting Cycenas v. United States, 120 Fed. Cl. 485, 503 (2015)). Plaintiff moved for leave to file a sur-reply to defendant's reply, which the court granted. Plaintiff filed its sur-reply brief, and defendant filed a response to plaintiff's sur-reply brief. Based on issues raised in the parties' filings regarding defendant's motion to dismiss, the court ordered simultaneous supplemental briefing.

13

**DISCUSSION**

I.      **Count I: Alleged Breach of the 2009 MTW Agreement.**

        Defendant has moved to dismiss plaintiff's breach of contract claim for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). Count I of the complaint alleges that defendant breached the 2009 MTW Agreement when the government decreased plaintiff's Section 9 operating subsidy for the 2012 calendar year based solely on plaintiff's participation in the MTW demonstration program. The parties in the above-captioned case do not challenge whether the 2009 MTW Agreement is a valid, enforceable contract. Defendant argues that "the MTW agreement cannot fairly be interpreted as mandating the payment of money damages in the event of a breach and therefore is not money-mandating within the meaning of the Tucker Act." As addressed more fully below, defendant presents a string of scattershot arguments of why the 2009 MTW Agreement allegedly falls outside of this court's jurisdiction. Plaintiff, in response, argues that "[t]he language of the MTW Agreement establishes that money damages are available," and argues that, "[a]ccordingly, the MTW Agreement can fairly be interpreted as contemplating monetary damages in the event of breach." (internal quotation marks omitted). Plaintiff also argues that because Judges of this court have found that HUD had breached public housing contracts between HUD and various public housing authorities, see Boaz Housing Authority v. United States, 141 Fed. Cl. 74 (2018), Public Housing Authorities Directors Association v. United States, 130 Fed. Cl. 522 (2017), and Housing Authority of Santa Clara v. United States, 125 Fed. Cl. 557 (2016), this court should find that plaintiff's 2009 MTW Agreement falls within this court's jurisdiction.

        "Subject-matter jurisdiction may be challenged at any time by the parties or by the court sua sponte." Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (citing Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); see also Int'l Elec. Tech. Corp. v. Hughes Aircraft Co., 476 F.3d 1329, 1330 (Fed. Cir. 2007). The Tucker Act, 28 U.S.C. § 1491 (2018), grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289-90 (2009); see also United States v. Mitchell, 463 U.S. 206, 216 (1983); Alvarado Hosp., LLC v. Price, 868 F.3d 983, 991 (Fed. Cir. 2017); Greenlee Cnty., Ariz. v. United States, 487

F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999). "Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. at 216; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); N.Y. & Presbyterian Hosp. v. United States, 881 F.3d 877, 881 (Fed. Cir. 2018); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), cert. denied, 571 U.S. 945 (2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008) ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages against the United States."); Golden v. United States, 118 Fed. Cl. 764, 768 (2014). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The Ontario Power Generation, Inc. court wrote:

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver. . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605-06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S. [392,] 401-02 [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ont. Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. at 400); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)."). "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); see also N.Y. & Presbyterian Hosp. v. United States, 881 F.3d at 881; Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (noting that the absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act"); Price v. United States, 133 Fed. Cl. 128, 130 (2017); Peoples v. United States, 87 Fed. Cl. 553, 565-66 (2009).

When deciding a case based on a lack of subject matter jurisdiction or for failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 87, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007) (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002)))); see also Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016) ("In deciding a motion to dismiss, a court is required to accept as true all factual allegations pleaded." (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009))); Fid. & Guar. Ins. Underwriters, Inc. v. United States, 805 F.3d 1082, 1084 (Fed. Cir. 2015); Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). A plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2018); Fed. R. Civ. P. 8(a)(1), (2) (2019); see also Ashcroft v. Iqbal, 556 U.S. at 677-78 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570). To properly state a claim for relief, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in

part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)); Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981) ("[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss."), aff'd, 460 U.S. 325 (1983). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

The jurisdictional analysis for a contract claim, such as plaintiff's Count I, however, is different from a claim alleging a violation of a statute or regulation, such as plaintiff's Count II, alleging a violation of Section (f) of the MTW Statute, and Count III, alleging a violation of the 2012 Appropriations Act. See Higbie v. United States, 778 F.3d 990, 993 (Fed. Cir.) ("Contract law is a separate source of law compensable under the Tucker Act."), cert. denied, 136 S. Ct. 37 (2015); see also Holmes v. United States, 657 F.3d 1303, 1314 (Fed. Cir. 2011) ("In our view, when referencing the money-mandating inquiry for Tucker Act jurisdiction, the cases logically put to one side contract-based claims."). The Federal Circuit has explained that, in "'a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary.'" LaBatte v. United States, 899 F.3d 1373, 1378 (Fed. Cir. 2018) (quoting Holmes v. United States, 657 F.3d at 1314) (holding that appellant's allegations and prayer for monetary relief for his breach of a settlement agreement claim were "more than sufficient" to establish jurisdiction in the United States Court of Federal Claims); see also Rocky Mountain Helium, LLC v. United States, 841 F.3d 1320, 1327 (Fed. Cir. 2016) ("Where there is a breach of a government contract, 'as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement.'" (quoting Sanders v. United States, 252 F.3d 1329, 1334 (Fed. Cir. 2001)); Higbie v. United States, 778 F.3d at 993 ("As with private agreements, when a government contract is breached, there is a presumption that a damages remedy will be available." (citing Sanders v. United States, 252 F.3d at 1334)); Sanders v. United States, 252 F.3d at 1334 (noting that in the "civil context," "'damages are always the default remedy for breach of contract'" (quoting United States v. Winstar Corp., 518 U.S. 839, 885 (1996) (plurality opinion))); Restatement (Second) of Contracts § 346 cmt. a (1981) ("Every breach of contract gives the injured party a right to damages against the party in breach, unless the contract is not enforceable against that party, as where he is not bound because of the Statute of Frauds."). "'Typically, based on that presumption, "''no further inquiry is required'"'' into whether money damages are available.'" LaBatte v. United States, 899 F.3d at 1379 (quoting Rocky Mountain Helium, LLC v. United States, 841 F.3d at 1327 (quoting Holmes v. United States, 657 F.3d at 1314)); see also Higbie v. United States, 778 F.3d at 993 (citing Holmes v. United States, 657 F.3d at 1314). "This is true, even when 'there [was] no language in the agreements indicating that the parties did not intend for money damages to be available in the event of breach.'" LaBatte v.

United States, 899 F.3d at 1379 (alterations in original) (quoting Holmes v. United States, 657 F.3d at 1316); Greenhill v. United States, 81 Fed. Cl. 786, 790 (2008) ("The fact that the settlement agreement did not specifically provide for money damages in the event of a breach does not deprive the Court of jurisdiction; money damages are the default remedy for breach of contract, and 'there is no generic requirement under the Tucker Act that contracts must include specific language indicating that damages will be paid upon a breach.'" (quoting Stovall v. United States, 71 Fed. Cl. 696, 700 (2006))).

"The Government, however, has not consented to suit under the Tucker Act for every contract." Higbie v. United States, 778 F.3d at 993 (citing Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343). There are limited circumstances in which the presumption that money damages are available in a breach of contract claim may not apply. As the United States Court of Appeals for the Federal Circuit explained in Rocky Mountain Helium, LLC v. United States:

> We have found that money damages are not available in a breach of contract case only in a limited number of situations—*e.g.*, where a contract expressly disavows money damages, see [Holmes v. United States, 657 F.3d at 1314] (distinguishing such cases), where the breach alleged was of a confidentiality provision in an agreement defining the terms of an alternative dispute resolution process, Higbie [v. United States], 778 F.3d at 995, where the agreement concerned a criminal defendant's release on bail, Sanders [v. United States], 252 F.3d at 1331, and where a special government cost-sharing agreement, rather than a procurement or sales contract, was at issue, Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1344-46 (Fed. Cir. 2008).

Rocky Mountain Helium, LLC v. United States, 841 F.3d at 1327 (emphasis in original). Also, as a Judge of this court explained:

> [A]greements that are "entirely concerned with the conduct of parties in a criminal case, without a clear, unmistakable statement triggering monetary liability, do not invoke Tucker Act jurisdiction." Higbie v. United States, 778 F.3d 990, 993 (Fed. Cir. 2015) (citing Sanders v. United States, 252 F.3d 1329 (Fed. Cir. 2001)). Witness protection agreements related to criminal cases fall into the same category. See Grundy v. United States, 2 Cl. Ct. 596, 597-98 (1983) (finding no jurisdiction where plaintiff alleged breach of a witness protection agreement).

Marchena v. United States, 128 Fed. Cl. 326, 332 (2016) (finding that plaintiff's breach of a protection agreement claim, regarding government protection in a criminal case, did not give rise to a government obligation to pay money and, thus, was not money-mandating for jurisdictional purposes), aff'd, 702 F. App'x 988 (Fed. Cir. 2017); see also Speed v. United States, 97 Fed. Cl. 58, 67, 68 n.12 (2011) (noting that the presumption of money damages applies except in limited circumstances, including "agreements arising out of the criminal justice system," "the unique cost-share agreement at issue in Rick's

Mushroom,"[3] or "in cases in which the contract at issue explicitly provided alternative remedies in the event of a breach").

In addition, a court may require the moving party to prove that damages are available when a contract "could reasonably be interpreted to involve purely nonmonetary relief." Higbie v. United States, 113 Fed. Cl. 358, 364 (2013), aff'd, 778 F.3d 990 (Fed. Cir. 2015). In Higbie, the moving party brought a breach of contract claim, alleging that the government breached a confidentiality provision of a mediation agreement and sought $500,000.00 in compensation. See id. at 360. The government moved to dismiss the breach of contract claim for lack of subject matter jurisdiction. See id. at 361. The United States Court of Federal Claims noted that "there is a presumption that a damages remedy is available in the civil context" for a breach of contract claim, but that, "where a contract could reasonably be interpreted to involve purely nonmonetary relief, the Court may require a plaintiff to render proof that the contract" could fairly be interpreted as requiring monetary damages. See id. at 364. The United States Court of Federal Claims found that because the mediation agreement in Higbie "did not address anything remotely monetary," and was "limited to the parties' conduct during and after the mediation process," the burden was on the Higbie plaintiff to prove that the mediation agreement contemplated monetary damages, which the court ultimately found the Higbie plaintiff did not sufficiently carry. See id.

On appeal, the United States Court of Appeals for the Federal Circuit noted that mediation agreement provided for the "exclusion of statements made during mediation from proceedings unrelated to the mediation," which was a "non-monetary remedy." Higbie v. United States, 778 F.3d at 994. The Federal Circuit explained that Tucker Act jurisdiction may "be lacking if relief for breach of contract could be entirely non-monetary. In such a case, it is 'proper for the court to require a demonstration that the agreements could fairly be interpreted as contemplating monetary damages in the event of breach.'" Id. at 993 (quoting Holmes v. United States, 657 F.3d at 1315). The Federal Circuit found the moving party had failed to demonstrate this court's jurisdiction over its breach of contract claim, having not pointed "to a single provision in the agreement indicating money damages were contemplated." Id. at 993.

---

[3] The cost-share agreement at issue in Rick's Mushroom was an agreement between the government and Rick's Mushrooms, Inc. for "implementing conservation practices in a facility for recycling of mushroom waste." Rick's Mushroom Serv., Inc. v. United States, 521 F.23d at 1340. As discussed further below, the Federal Circuit in Rick's Mushroom upheld the United States Court of Federal Claims' finding that the cost-share agreement was not a procurement contract because "the agreement did not provide for transfer of goods or services to the government, there was no evidence of a buyer-seller relationship, and the government did not receive a direct benefit from the operation of the [spent mushroom substrate] transfer facility." Id. at 1344. The Federal Circuit in Rick's Mushroom held that the United States Court of Federal Claims did not have jurisdiction over the cost-share agreement under the court's jurisdiction contained at 28 U.S.C. § 1491(a)(2).

Based on a review of the 2009 MTW Agreement, which was attached to plaintiff's complaint, under the section of the 2009 MTW Agreement, titled "Termination and Default," the 2009 MTW Agreement lists the various monetary remedies available to the government in the event that SAHA violates the 2009 MTW Agreement, such as requiring "reimbursement by the [public housing] Agency[4] to HUD for amounts used in violation of this Restated Agreement," allowing HUD to "[r]educe/offset the Agency's future funding," and allowing HUD to "[t]ake any other corrective or remedial action legally available." Following the government's list of remedies, the 2009 MTW Agreement does not specifically provide monetary or nonmonetary remedies available to SAHA but notes that SAHA "may choose to terminate" the 2009 MTW Agreement "at any time," at which point SAHA "will then begin to transition out of MTW, and will work with HUD to establish an orderly phase-out of MTW activities." Possible monetary consequences flowing the 2009 MTW Agreement are not prohibited by the 2009 MTW Agreement should HUD choose to reduce or terminate a public housing agency's funding. In addition, defendant in the above-captioned case has not alleged in any of its filings that the 2009 MTW Agreement provides plaintiff with purely non-monetary relief which could potentially overcome the well-established presumption that monetary damages are available in a breach of contract claim. The absence of an explicit monetary remedy does not remove the 2009 MTW Agreement from this court's breach of contract jurisdiction. See Rocky Mountain Helium, LLC v. United States, 841 F.3d at 1327; see also Greenhill v. United States, 81 Fed. Cl. at 790. Moreover, plaintiff's 2009 MTW Agreement is not in one of the limited categories of contracts that fall outside of this court's jurisdiction. See Rocky Mountain Helium, LLC v. United States, 841 F.3d at 1327. For example, the 2009 MTW Agreement does not "expressly disavow[] money damages," it does not relate to criminal activity, it does not define the terms of an alternative dispute resolution process, and it does not provide a "special" cost-sharing arrangement between the government and plaintiff. See id. Therefore, the presumption that money damages are available in a breach of contract case applies in this case.

Monetary Damages or "Strings-Attached" Funds

Defendant argues that the presumption of monetary damages should not apply to the 2009 MTW Agreement in this case because "SAHA demands relief that it is not entitled to receive under the laws and agreements[5] governing its relationship with HUD." According to defendant:

> Specifically, the Section 9(e) Operating Fund at issue here—like the statutory scheme that the Federal Circuit determined to be non-money mandating in Lummi—does not contemplate a free and clear transfer of money from the Government to program participants.

---

[4]  The 2009 MTW Agreement defines "Agency" as SAHA.

[5]  It is unclear to which "agreements" defendant is referring. The only agreement that plaintiff is alleging was breached is the 2009 MTW Agreement.

Rather, Congress intended only that SAHA and other PHAs receive Federal funds that they could use solely for eligible activities with ongoing supervision by HUD, *i.e.*, with "strings attached," as the <u>Lummi</u> court put it. In such circumstances, this Court lacks subject-matter jurisdiction under the Tucker Act to award money damages as a remedy for the alleged violation of program formulae and procedures. Similarly, when a plaintiff shows only a right to restricted use of further Federal funding under ongoing supervision and a relationship with a Federal agency (to ensure proper use on statutorily defined objects), a money damages remedy under the Tucker Act should not be implied because it would be inappropriate to award unrestricted money in place of statutorily restricted-use funding.

(emphasis in original). Defendant claims that the strings attached to plaintiff's Section 9 operating subsidy are that the subsidy could be used "solely for eligible activities with ongoing supervision by HUD." As support, defendant relies heavily on <u>Lummi Tribe of the Lummi Reservation, Washington v. United States</u>, 870 F.3d 1313 (Fed. Cir. 2017), <u>cert. denied</u>, 139 S. Ct. 64 (2018)  (<u>Lummi</u>), a case in which the United States Court of Appeals for the Federal Circuit found that certain statutory provisions were not money-mandating because the federal funds provided by the statutory provisions came with strings attached, "including subsequent supervision and adjustment" by the government over the funds at issue. <u>See</u> <u>Lummi</u>, 870 F.3d at 1318-19. Defendant also cites to the United States Court of Appeals for the Federal Circuit's decision in <u>National Center for Manufacturing Sciences v. United States</u>, 114 F.3d 196 (Fed. Cir. 1997) (<u>NCMS</u>) and the United States Supreme Court's decision in <u>Bowen v. Massachusetts</u>, 487 U.S. 879 (1988).

Defendant further argues that plaintiff is seeking "specific performance of the MTW Agreement as a means to obtaining a larger share of a particular yearly appropriation," not a monetary remedy. Defendant states that because this court "'is not empowered to grant'" requests for specific performance, plaintiff's breach of contract claim should be dismissed for lack of subject matter jurisdiction. (quoting <u>NCMS</u>, 114 F.3d at 198).

Plaintiff argues that it is not seeking "'strings-attached'" funds but is seeking "damages to compensate for the amount of funding it should have received but for HUD's breach of the MTW Agreement."  Plaintiff also argues that defendant's reliance on <u>Lummi</u>, <u>NCMS</u>, and <u>Bowen</u> "is misplaced for several reasons, largely due to the mischaracterization of the nature of the relief sought by SAHA," which is damages, not "'strings-attached'" funds. Regarding <u>Lummi</u>, plaintiff argues that it is "not controlling for the simple fact that it did not involve any contractual agreement between the parties, but rather relied entirely on the statutory framework."

An "equitable remedy" is a "nonmonetary one such as an injunction or specific performance," <u>Black's Law Dictionary</u> (10th ed. 2014), and attempts "to give the plaintiff the very thing to which he was entitled." <u>Dep't of Army v. Blue Fox, Inc.</u>, 525 U.S. 255, 262 (1999) (quoting <u>Bowen v. Massachusetts</u>, 487 U.S. at 895). In particular, "specific performance" is "intended to produce as nearly as is practicable the same effect that the performance due under a contract would have produced. It usually, therefore, orders a

21

party to render the performance that he promised." Restatement (Second) of Contracts § 357 cmt. a (1981). Except under specific and limited provisions of the Tucker Act, this court cannot entertain claims for equitable remedies. See Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec., 490 F.3d 940, 943 (Fed. Cir. 2007) ("In order for a claim to be brought under either the Tucker Act or the Little Tucker Act, the claim must be for monetary relief; it cannot be for equitable relief, except in very limited circumstances not at issue here."); see also Massie v. United States, 226 F.3d 1318, 1321 (Fed. Cir. 2000) ("Except in strictly limited circumstances, see 28 U.S.C. § 1491(b)(2), there is no provision in the Tucker Act authorizing the Court of Federal Claims to order equitable relief."); Sonoma Apartment Assocs. v. United States, 134 Fed. Cl. 90, 104 (2017) ("[E]xcept in a limited number of statutorily defined circumstances not relevant here, the court cannot award nonmonetary equitable relief." (footnote omitted)); Health Republic Ins. Co. v. United States, 129 Fed. Cl. 757, 778 (2017).

The specific situations under which this court could order equitable relief include, for example, military pay cases, in which this court may order specific forms of declaratory relief that are "incident of and collateral to" a money judgment. See 28 U.S.C. § 1491(a)(2) ("To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States."). This court also may entertain non-monetary disputes in cases brought pursuant to the Contract Disputes Act, of 1978, codified, as amended, at 41 U.S.C. §§ 7101-7109 (2018) (CDA). See id. (noting that this court "shall have jurisdiction to render judgment upon any claim" arising under the CDA, "including" "other nonmonetary disputes"). The court also may provide equitable relief under its bid protest jurisdiction. See id. at § 1491(b)(2) ("[T]he courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."). This court also "shall have jurisdiction to hear any suit for and issue a declaratory judgment under section 7428 of the Internal Revenue Code of 1986 [26 U.S.C. § 7428 (2018)]." 28 U.S.C. § 1507 (2018).

Regarding a breach of contract claim brought pursuant to this court's general contract jurisdiction under 28 U.S.C. § 1491(a)(1), as plaintiff has brought in the above-captioned case, the only remedy available in this court is monetary relief. See Sonoma Apartment Assocs. v. United States, 134 Fed. Cl. at 104 (noting that "the court cannot award nonmonetary equitable relief" on a breach of contract claim brought pursuant to 28 U.S.C. § 1491(a)(1)); see also FAS Support Servs., LLC v. United States, 93 Fed. Cl. 687, 694 (2010) ("The major difference between a protest brought under 28 U.S.C. § 1491(b)(1) and one brought pursuant to an implied contract under 28 U.S.C. § 1491(a)(1) is the equitable relief which is available for the section 1491(b)(1) protest, but not for breach of the implied contract. Only monetary relief is available for breach of the implied contract . . . ."); Pryor v. United States, 85 Fed. Cl. 97, 103 (2008) ("Apart from ordering relief under 28 U.S.C. §§ 1491(a)(2) or (b)(2), the Court of Federal Claims has no power to grant a declaratory judgment. The Court of Federal Claims cannot adjudicate a complaint that seeks only declaratory relief." (citation omitted)).

As the United States Court of Appeals for the Federal Circuit explained in <u>Southern California Federal Saving & Loan Association v. United States</u>, 422 F.3d 1319, <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2005),"[t]here are three forms of damages typically awarded to compensate for breach of a contract," in this court, which are,

> expectation damages, restitutionary damages, and reliance damages. <u>Hansen Bancorp, Inc. v. United States</u>, 367 F.3d 1297, 1308 (Fed. Cir. 2004). Expectation damages give the non-breaching party the benefit of his bargain by putting him in as good a position as he would have been in had the contract been performed. <u>Bluebonnet Savings Bank, F.S.B. v. United States</u>, 266 F.3d 1348, 1355 (Fed. Cir. 2001). "Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." <u>Id.</u> Restitutionary damages restore the non-breaching party to the position he would have been in had there never been a contract to breach. <u>Landmark Land Co., Inc. v. United States</u>, 256 F.3d 1365, 1372 (Fed. Cir. 2001). Such damages, however, are not recoverable for actions taken voluntarily, beyond the obligations of the contract. <u>Id.</u> at 1375 ("the law is well settled . . . that in order to be compensable as restitution, the plaintiff's contribution must have been made in performance of its contractual obligations"). Reliance damages are damages designed to compensate a plaintiff for foreseeable loss caused by reliance on the contract. <u>Id.</u> at 1369.

<u>S. Cal. Fed. Sav. & Loan Ass'n v. United States</u>, 422 F.3d at 1334; <u>see also</u> <u>Glendale Fed. Bank, FSB v. United States</u>, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (noting that if a party cannot prove expectation damages, then the law provides for restitution damages, the objective of which is to "restore the parties to the status quo ante," i.e., the "'situation in which they found themselves before they made the contract'" (quoting Restatement (Second) of Contracts § 384 cmt. a (1981))); <u>Stovall v. United States</u>, 94 Fed. Cl. 336, 345 (2010) ("Three types of damages can be awarded to compensate for a breach of contract: expectation, restitutionary, and reliance.").

Expectation damages, at issue in this case, are designed to place the non-breaching party in the position it should have been had the breach not occurred. <u>See</u> <u>Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. and Urban Dev.</u>, 480 F.3d 1116, 1126-27 (Fed. Cir. 2007) (noting that if the appellant "were to obtain a judgment for breach of contract, the Court of Federal Claims could order payment of the insurance proceeds as a form of expectation damages, giving Suburban [appellant] the benefits it expected to receive had the Government not breached the insurance contract" (citing <u>Glendale Fed. Bank, FSB v. United States</u>, 239 F.3d at 1380); <u>Ind. Mich. Power Co. v. United States</u>, 422 F.3d 1369, 1373 ("The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." (citing <u>San Carlos Irrigation & Drainage Dist. v. United States</u>, 111 F.3d 1557, 1562, <u>reh'g denied</u> (Fed. Cir. 1997)), <u>reh'g denied</u> (Fed. Cir. 2005); <u>Bluebonnet Sav. Bank, F.S.B. v. United States</u>, 266 F.3d at 1355 ("'One way the law makes the non-

breaching party whole is to give him the benefits he expected to receive had the breach not occurred.'" (quoting <u>Glendale Fed. Bank, FSB v. United States</u>, 239 F.3d at 1380)); <u>Rebish v. United States</u>, 134 Fed. Cl. 308, 320 (2017) ("To make the non-breaching party whole, it is entitled to recover its reasonably foreseeable expectation damages for a breach of contract, but only where such damages 'are caused by the breach of the promisor.'" (quoting <u>Bluebonnet Sav. Bank, F.S.B. v. United States</u>, 266 F.3d at 1355)); <u>DMS Imaging, Inc. v. United States</u>, 123 Fed. Cl. 645, 655 (2015) ("The non-breaching party is entitled to expectation damages, *i.e.* relief 'sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed.'" (emphasis in original) (quoting <u>San Carlos Irrigation & Drainage Dist. v. United States</u>, 111 F.3d at 1563)).

Turning first to defendant's claim that plaintiff is seeking "specific performance," Count I of the complaint in the above-captioned case, entitled "BREACH OF THE MTW AGREEMENT," alleges a breach of the "MTW Agreement," which, according to plaintiff, and which defendant did not contest in any of its filings currently before the court, is a "valid, enforceable agreement between HUD and SAHA." (capitalization in original). Count I alleges:

> HUD breached the Anti-Discrimination Provision in Section II.A of the MTW Agreement by reducing SAHA's operating subsidy in the manner set forth above solely because SAHA is a MTW agency (specifically through HUD's policy requiring reduction of the operating subsidies of MTW agencies, regardless of whether the agency had excess reserves, while considering the existence of excess reserves in making the same determination for non-MTW agencies).

Count I of the complaint also alleges that, "[a]s a result of HUD's breach," plaintiff "was damaged in the amount of at least $2,874,719 and is entitled to recover same." The complaint states that plaintiff "brings this action to recover the difference in the 2012 operating subsidy SAHA actually received and the amount it should have received had HUD treated SAHA in the same manner as non-MTW agencies, as required by the applicable MTW Agreement." Plaintiff, therefore, is seeking expectation damages pursuant to Count I of its complaint. Nowhere in the complaint does plaintiff request specific performance of the 2009 MTW Agreement. Therefore, contrary to defendant's position, plaintiff's breach of contract claim is seeking compensatory monetary damages in the amount of $2,874,719.00 in order to place plaintiff in the position it should have been had the breach not occurred.

Turning to defendant's argument that plaintiff is seeking strings-attached funds, "as a general rule, unless otherwise provided by law, agency operating appropriations are not available to pay judgments against the United States." <u>GAO Redbook</u> at 14-31. This rule "preserved for Congress the opportunity to consider the court's decision and refuse to appropriate funds to pay any judgments with which Congress disagreed," and, thus, when Congress "declined to appropriate funds, the judgment creditor was left with a judicially approved claim against the United States but received no payment for it." <u>Id.</u>

This rule "was (and still is) part and parcel of the power of the purse. The courts adjudicate, but only Congress can appropriate." Id.

Congress, however, eventually became "burden[ed]" with requests to process specific appropriations to pay final judgments, and, therefore, created a "permanent, indefinite appropriation" of funds, codified at 31 U.S.C. § 1304 (2018), known as the "Judgment Fund," to pay final monetary judgments entered against the federal government in court. See id.; see also Moda Health Plan, Inc. v. United States, 892 F.3d 1311, 1326 (Fed. Cir. 2018) ("The Judgment Fund is a general appropriation of '[n]ecessary amounts' in order 'to pay final judgments' and other amounts owed via litigation against the government, subject to several conditions." (brackets in original) (quoting 31 U.S.C. § 1304)), petition for cert. filed, Case No. 18-1028 (Feb. 4, 2019); GAO Redbook at 14-61 ("Most court judgments against the United States are paid from the Judgment Fund, a permanent, indefinite appropriation established by 31 U.S.C. § 1304."). The Judgment Fund statute provides, in relevant part, that:

> (a) Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when--
> > (1) payment is not otherwise provided for;
> > (2) payment is certified by the Secretary of the Treasury; and
> > (3) the judgment, award, or settlement is payable--
> > > (A) under section 2414, 2517[6], 2672, or 2677 of title 28;
> > > (B) under section 3723 of this title;
> > > (C) under a decision of a board of contract appeals; or
> > > (D) in excess of an amount payable from the appropriations of an agency for a

---

[6] The statute at 28 U.S.C. § 2517 (2018), the section referenced in the above-quoted portion of the Judgment Fund statute, states:

> (a) Except as provided by chapter 71 of title 41, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor, on presentation to the Secretary of the Treasury of a certification of the judgment by the clerk and chief judge of the court.
> (b) Payment of any such judgment and of interest thereon shall be a full discharge to the United States of all claims and demands arising out of the matters involved in the case or controversy, unless the judgment is designated a partial judgment, in which event only the matters described therein shall be discharged.

28 U.S.C. § 2517.

> meritorious claim under section 2733 or
> 2734 of title 10, section 715 of title 32, or
> section 20113 of title 51.

31 U.S.C. § 1304(a). Further, payment from the Judgment Fund "contemplates a money judgment, that is, a judgment directing the government 'to pay final judgments, awards, compromise settlements, and interests and costs,' as opposed to a judgment directing the government to perform some specific action." GAO Redbook at 14-38 (quoting 31 U.S.C. § 1304(a)).

In Count I of its complaint, plaintiff seeks a monetary award of compensatory damages in the amount of $2,874,719.00 for the government's alleged breach of the 2009 MTW Agreement. Assuming plaintiff is successful on the merits of its breach of contract claim and judgment is entered in plaintiff's favor, plaintiff's damages award would be paid from the Judgment Fund, which would not require the court to order defendant to release allegedly strings-attached funds from HUD's Section 9 Operating Fund. Even if the court could order defendant to release Section 9 operating subsidies, as defendant notes in its reply in support of its motion to dismiss, "HUD has exhausted Congress's appropriation to pay Operating Fund subsidies for calendar year 2012. Indeed, the insufficiency of that appropriation spawned this and other suits[7] challenging HUD's calculation and payment of Operating Fund subsidies to PHAs in 2012." The parties in the above-captioned case also agree that, if this court were to find in favor of plaintiff on Count I of the complaint, the Judgement Fund, and not Section 9's Operating Fund, would be available to pay plaintiff's damages claim. Defendant concedes in its reply in support of its motion to dismiss that "any judgment in SAHA's favor would be paid out of the Judgment Fund, not the Operating Fund." Plaintiff states in its sur-reply to the government's motion to dismiss that, "[a]s HUD points out, any judgment would be paid out of the Judgment Fund and would not require injunctive relief mandating appropriation of funds or require HUD to alter its future disbursement of funds." Therefore, plaintiff is not seeking the repayment of alleged strings-attached funds from HUD's 2012 Section 9 Operating Fund, but an award of monetary damages to be paid from the Judgment Fund.

Also, defendant's reliance on Lummi, NCMS, and Bowen for the proposition that plaintiff cannot recover "unrestricted money damages" for defendant's alleged breach of

---

[7] As previously noted, a public housing agency brought suit in this court alleging that the government's reduction of MTW agencies' Section 9 operating subsidy for 2012 was in violation of its MTW agreement and the 2012 Appropriations Act, which are two of the same claims that plaintiff asserts in the above-captioned case. See Hous. Auth. of City of New Haven v. United States, 140 Fed. Cl. at 775. In addition, as discussed above, various plaintiffs brought suit in this court alleging that the government's reduction of the Section 9 operating subsidy for 2012 was across the board, for MTW and non-MTW agencies alike, a violation of their annual contribution contracts, a different housing contract than the MTW Agreement at issue in this case. See Boaz Hous. Auth. v. United States, 141 Fed. Cl. at 79; see also Pub. Hous. Auths. Dirs. Ass'n. v. United States, 130 Fed. Cl. at 522.

the 2009 MTW Agreement is misplaced. In <u>Lummi</u>, the moving party brought a statutory claim for payment pursuant to the Native American Housing Assistance and Self-Determination Act of 1996, codified at 25 U.S.C. §§ 4101-4243, (NAHASDA), which "established an annual block grant system, whereby Indian tribes receive direct funding in order to provide affordable housing to their members." <u>Lummi v. United States</u>, 870 F.3d at 1315. The amount of funding which a tribe could receive in <u>Lummi</u> was established "according to a regulatory formula based on several factors." <u>Id.</u> The United States Court of Appeals for the Federal Circuit found that the moving party's statutory claim fell outside of the United States Court of Federal Claim's subject matter jurisdiction because the NAHASDA was not money-mandating. <u>See id.</u> at 1319. According to the <u>Lummi</u> court:

> Under NAHASDA, the Tribes are not entitled to an actual payment of money damages, in the strictest terms; their only alleged harm is having been allocated too little in grant funding. Thus, at best, the Tribes seek a nominally greater strings-attached disbursement. But any monies so disbursed could still be later reduced or clawed back. <u>See</u> 25 U.S.C. § 4161(a)(1). And any property acquired with said monies would be "held in trust" by the Tribes, "as trustee for the beneficiaries" of NAHASDA. 2 C.F.R. § 200.316; <u>see</u> <u>generally</u> 24 C.F.R. §§ 85.1, 1000.26. The Tribes are even restricted with respect to the particular bidding and bond terms they may use for, say, housing construction contracts. <u>See</u> 2 C.F.R. § 200.325; 24 C.F.R. § 1000.26.

> *   *   *

> Here, the underlying claim is not for presently due money damages. It is for larger strings-attached NAHASDA grants—including subsequent supervision and adjustment—and, hence, for equitable relief. Indeed, *any* such claim for relief under NAHASDA would necessarily be styled in the same fashion; the statute does not authorize a free and clear transfer of money. Accordingly, the Claims Court erred in finding NAHASDA to be money mandating.

<u>Lummi v. United States</u>, 870 F.3d at 1318-19 (capitalization and emphasis in original).

Although plaintiff in the above-captioned case is alleging that it was improperly underpaid federal funding in connection with the government's federal housing program, similar to the appellants in <u>Lummi</u>, the similarities between this case and <u>Lummi</u> end there. In <u>Lummi</u>, the United States Court of Appeals for the Federal Circuit was addressing whether the NAHASDA was money-mandating for jurisdictional purposes. The issue currently before the court, however, is whether a contract, and not a statute, is money-mandating. Although defendant claims in its reply in support of its motion to dismiss that this is a "distinction without a difference," defendant overlooks a critical point. The jurisdictional analysis for determining whether a statute is money-mandating versus whether a contract is money-mandating is not the same. Unlike with a statute, for which the court must "always ask" whether the statute "can be fairly interpreted as mandating

compensation," see Eastport S.S. Corp. v. United States, 372 F.2d at 1009, a contract is afforded a well-established presumption that monetary damages are available, and this court's jurisdictional inquiry looks to whether there is sufficient evidence to rebut such a presumption, such as a contractual provision explicitly precluding monetary damages. See LaBatte v. United States, 899 F.3d at 1378; see also Rocky Mountain Helium, LLC v. United States, 841 F.3d at 1327; Higbie v. United States, 778 F.3d at 993. Defendant's reliance on Lummi, therefore, is misplaced.

Defendant also cites to NCMS, claiming that this "case is no different than NCMS" because "[a]dditional action by the parties or the Court would be required to ensure that SAHA does not receive a 'naked money judgment,'" which according to defendant is a judgment that comes with no "'prospective' strings" attached to the "use of that judgment." (quoting NCMS, 114 F.3d at 202). In NCMS, the National Center for Manufacturing Sciences (NCMS) filed a complaint in the United States District Court for the District of Columbia pursuant to the Administrative Procedures Act, Pub. L. No. 79-404, 60 Stat. 237 (1946), currently codified at 5 U.S.C. §§ 701-706 (2018) (APA), seeking an order directing the government to release the full amount of funds appropriated to NCMS under the Department of Defense Appropriations Act for Fiscal Year 1994, Pub. L. No. 103-139, 107 Stat. 1418 (1993) (1994 Appropriations Act). See NCMS v. United States, 114 F.3d at 197-98. Within the 1994 Appropriations Act, Congress had explicitly appropriated funds to the appellant by stating "[t]hat not less than $40,000,000 of the funds appropriated in this paragraph shall be made available only for the National Center for Manufacturing Sciences." Id. at 198 (internal quotation marks omitted). According to the 1994 Appropriations Act, the Air Force would receive the funds and ultimately was to distribute them to NCMS through a "Cooperative Agreement." See id. The Cooperative Agreement "noted that the government's share for full performance of the award was estimated at a maximum of $40,000,000, but that only $24,125,000 was currently available and allotted at the time of the award." Id. (internal quotation marks omitted). The Air Force ultimately only distributed $24,125,000.00 of the $40,000,000.00 provided for in the 1994 Appropriations Act, leaving $15,875,000.00 undistributed. See id. NCMS's District Court complaint sought "an order directing the Air Force to release the remaining funds appropriated for fiscal year 1994," and brought, in addition to other claims, a claim seeking "specific performance of the Cooperative Agreement." Id. The government filed a motion seeking to transfer the case to United States Court of Federal Claims and the federal District Court granted the motion, stating that NCMS's claim for specific performance of the Cooperative Agreement between NCMS and the government was actually "a contract claim against the government in excess of $10,000" over which "there is no District Court jurisdiction" and instead should have been brought under the Tucker Act in the United States Court of Federal Claims. Id. (internal quotation marks omitted).

On interlocutory appeal, the United States Court of Appeals for the Federal Circuit determined that NCMS's contract claim for specific performance of the Cooperative Agreement was a claim that should have remained before a federal District Court under APA review and should not have been transferred to the United States Court of Federal Claims. In so deciding, the NCMS court analyzed whether the NCMS's claim met two requirements for federal District Court jurisdiction pursuant to the APA. See id. at 199.

According to the <u>NCMS</u> court, a federal District Court has APA jurisdiction over claims against the government arising in (1) "'[a]n action in a court of the United States seeking relief other than money damages,'" and (2) "only 'if there is no other adequate remedy in a court.'" <u>See id.</u> (quoting 5 U.S.C. §§ 702, 704 (1994)). "Thus, if a Tucker Act suit in the Court of Federal Claims provides an adequate remedy, APA review in the district court is not available." <u>NCMS v. United States</u>, 114 F.3d at 199.

Regarding the first requirement for APA jurisdiction, that the moving party seek relief "other than money damages," the <u>NCMS</u> court noted that, although "[s]ome portions of NCMS's complaint," which the <u>NCMS</u> court referred to as "inartful[ly] draft[ed]," suggest "that NCMS seeks a 'naked money judgment' for $15,875,000," NCMS is actually demanding "the release of the remaining funds referred to in the Appropriations Act," which "is not a demand for 'money damages' within the meaning of the exception to the APA's waiver of sovereign immunity." <u>See id.</u> at 197, 201. According to the <u>NCMS</u> court, NCMS's contract claim seeking "specific performance of the Cooperative Agreement between NCMS" and the government is "not seeking money in compensation for losses that it has suffered or will suffer as a result of the withholding of those funds" but instead "is seeking funds to which it claims it is entitled under a statute." <u>See id.</u> at 200.

Regarding the APA's second requirement for United States District Court jurisdiction, that there be "no other adequate remedy in a court," the <u>NCMS</u> court explained that no other adequate remedy existed outside of a United States District Court, and, consequently, NCMS's claim for specific performance should not have been transferred to the United States Court of Federal Claims. <u>See id.</u> at 202. The <u>NCMS</u> court explained:

> Because only $24,125,000 was allotted to the Cooperative Agreement, NCMS's claim would require that the remaining $15,875,000 be obligated and made available to NCMS either by supplementation of the Cooperative Agreement or by formation of a new agreement. Thus, NCMS is in effect asking that the Air Force be required to expand the existing contractual relationship or to create a new one to cover the remaining appropriated but unobligated funds.

<u>See id.</u> According to the <u>NCMS</u> court, "[t]he Tucker Act, however, does not empower the Court of Federal Claims to grant that kind of equitable relief," and, therefore, the "remedy provided by a Tucker Act suit in the Court of Federal Claims does not serve as the 'other adequate remedy in a court'" that "would be sufficient to divest the district court of the authority to conduct APA review in this case."[8] <u>Id.</u>

---

[8] Although the <u>NCMS</u> court found that the Tucker Act could not provide an adequate remedy for the <u>NCMS</u> appellant's breach of contract claim, the <u>NCMS</u> appellant, however, was seeking an equitable remedy for its breach of contract claim, not monetary damages, which is a form of relief that the Tucker Act can provide in a breach of contract case and the remedy which plaintiff seeks in the above-captioned case.

Unlike in NCMS, this court is tasked with analyzing whether plaintiff's breach of contract claim satisfies the jurisdictional requirement under the Tucker Act, not the APA, which was at issue in NCMS. As previously indicated, the Tucker Act provides this court with jurisdiction over a breach of contract claim seeking monetary damages from the government. See 28 U.S.C. § 1491(a)(1). In addition, SAHA comes armed in this court with the well-established presumption that monetary damages are available in the event of a breach of contract. See LaBatte v. United States, 899 F.3d at 1378; see also Rocky Mountain Helium, LLC v. United States, 841 F.3d at 1327; Higbie v. United States, 778 F.3d at 993.

Also, the nature of the relief sought by the NCMS appellant differs from the nature of the relief sought by the plaintiff in the above-captioned case. In NCMS, the appellant specifically sought "specific performance" of a "Cooperative Agreement" and requested "an order directing the Air Force to release the remaining funds appropriated for fiscal year 1994." NCMS v. United States, 114 F.3d at 198. The NCMS appellant noted that its specific performance claim was "premised on rights stemming from the Appropriations Act, not on rights stemming from a contract between NCMS and the government." Id. The NCMS appellant also conceded that its request for a "release" of appropriated funds was not the equivalent of seeking an "an unconditional payment" of monetary damages because "any additional funds released under the Appropriations Act would be subject to restrictions and constraints reflected either in a supplement to the Cooperative Agreement or in a new agreement between NCMS and the Air Force." See id. at 198-99.

Contrastingly, as determined above, the plaintiff in the above-captioned case has not requested "specific performance" of its 2009 MTW Agreement, but compensatory monetary damages for the government's alleged breach of the 2009 MTW Agreement. In addition, plaintiff has specifically tied its breach of contract claim to the 2009 MTW Agreement, not on "rights stemming from" an appropriations act. As previously noted, assuming plaintiff is ultimately successful on the merits of its breach of contract claim in this court, payment of plaintiff's damages award would be made from the Judgment Fund, which provides for the payment of monetary awards included in federal court issued judgments entered against the government. See 31 U.S.C. § 1304(a). Thus, NCMS does not assist defendant in overcoming the presumption that money damages are available for plaintiff's breach of contract claim.

Defendant also cites to Bowen for its proposition that plaintiff cannot recover an unrestricted award of money damages for its breach of contract claim. In Bowen, the United States Supreme Court considered whether federal District Courts possessed jurisdiction to review "a final order of the Secretary of Health and Human Services refusing to reimburse a State for a category of expenditures under its Medicaid program." Bowen v. Massachusetts, 487 U.S. at 882. The Bowen court explained that, as part of the federal government's Medicaid program, the Department of Health and Human Services (HHS) provides "'financial assistance to participating States to aid them in furnishing health care to needy persons.'" Id. at 883 (quoting Harris v. McRae, 448 U.S. 297, 308 (1980)). The States, in turn, develop their "own program describing conditions of eligibility and covered services." Id. If the Secretary of HHS believes that "a State's expenditures do not comply

with" federal law or regulations, the Secretary of HHS "may 'disallow' reimbursement for 'any item or class of items'" by issuing a "disallowance order," which is subject to judicial review. Id. at 885 (quoting 42 U.S.C. § 1316(d) (1988)).

The State of Massachusetts was the moving party in Bowen, which had participated in the "Medicaid program continuously since 1966," and provided, among other services, "medical and rehabilitative services to patients in intermediate care facilities for the mentally retarded." Bowen v. Massachusetts, 487 U.S. at 885-86. Because these services were performed jointly by the Massachusetts State Departments of Mental Health and Education, as opposed to solely by the Massachusetts State Department of Mental Health, the "Regional Administrator" for "Health Care Financing Administration," an office within HHS, notified the State of Massachusetts that he had disallowed $6,414,964.00 in federal reimbursement for such services for the period "July 1, 1978 to December 31, 1980." Id. at 886-87. HHS's "Departmental Grant Appeals Board" (Board), affirmed the disallowance decision on May 31, 1983. Id. at 887. The Health Care Financing Administration disallowed a second claim for the same category of services in the amount of $4,908,994.00 for the period January 1, 1981 through June 30, 1982. See id. at 887-88.

The State of Massachusetts filed a complaint in the United States District Court for the District of Massachusetts which "requested declaratory and injunctive relief and specifically asked the District Court to 'set aside' the Board's order" and release the remaining Medicare reimbursement funds it allegedly was denied under the first disallowance claim. See id. at 888. In its first decision, the United States District Court did not address any jurisdictional issues or order any monetary payment by the government, and "simply reversed" the government's decision disallowing the reimbursement claims. See id. In a separate decision regarding the government's second disallowance claim, the United States District Court entered judgment, based on the analysis included in its first decision. See id. In a consolidated appeal, the United States Court of Appeals to the First Circuit decided that the District Court had no jurisdiction to order the Secretary of HHS to pay money to the State of Massachusetts, but that the United States District Court had jurisdiction to review the "Board's disallowance decision and to grant declaratory and injunctive relief." Id. at 889.

The Bowen parties each filed a petition for certiorari, and the United States Supreme Court granted both petitions. See id. at 890-91. The federal government argued that the State of Massachusetts' claim for "declaratory and injunctive relief" did not satisfy two conditions under the APA for federal District Court jurisdiction. See id. at 891. According to the federal government, under 5 U.S.C. § 702 (1988) of the APA, which allows an action to be maintained in United States District Court so long as the action is "'seeking relief other than money damages,'" the State of Massachusetts' claim was not seeking relief other than money damages. Id. at 891, 893 (quoting 5 U.S.C. § 702). The federal government then argued that, even if the claim satisfied § 702, it did not satisfy 5 U.S.C. § 704 (1988) of the APA, which allows relief to be provided in a United States District Court when "'there is no other adequate remedy in any court.'" Id. at 902 n.32

(quoting 5 U.S.C. § 704). The State of Massachusetts argued that the federal District Court "had jurisdiction to grant complete relief." Id. at 890-91.

The Bowen court held that jurisdiction over the State of Massachusetts' claim was properly found in the United States District Court under APA review rather than the United States Claims Court.[9] The Bowen court explained that the State of Massachusetts' claim for "declaratory and injunctive relief" satisfied § 702 of the APA because the claim was not seeking an award of "money damages." See id. at 893. The Bowen court noted that, "insofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages," and "more importantly, even the monetary aspects of the relief that the State sought are not 'money damages' as that term is used in the law." Id. The Bowen court explained:

> Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with backpay, or for "the recovery of specific property *or monies,* ejectment from land, or injunction either directing or restraining the defendant officer's actions." Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 688, 69 S. Ct. 1457, 1460, 93 L. Ed. 1628 (1949) (emphasis added). The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as "money damages."

Bowen v. Massachusetts, 487 U.S. at 893-94 (emphasis in original). The Bowen court stated:

> The State's suit to enforce § 1396b(a) of the Medicaid Act, which provides that the Secretary "shall pay" certain amounts for appropriate Medicaid services, is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money.

Bowen v. Massachusetts, 487 U.S. at 900 (emphasis in original).

The Bowen court also explained that the State of Massachusetts' claim for "declaratory and injunctive" relief was not barred by § 704 of the APA, which precludes federal District Court review if there is an adequate remedy available in another court. See Bowen v. Massachusetts, 487 U.S. at 901-08. The Bowen court noted that "[t]he Claims Court does not have the general equitable powers of a district court to grant prospective relief," and stated:

---

[9] Prior to 1992, this court was referred to as the "United States Claims Court." In 1992, the court's name was changed to the "United States Court of Federal Claims."

> As the facts of these cases illustrate, the interaction between the State's administration of its responsibilities under an approved Medicaid plan and the Secretary's interpretation of his regulations may make it appropriate for judicial review to culminate in the entry of declaratory or injunctive relief that requires the Secretary to modify future practices. We are not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties.

Id. at 905. The Bowen court also explained that the United States Claims Court's ability to "entertain" a disallowance claim by the federal government would be "doubtful." See id. This is because if a State retained the amount covered by the disallowance during the Board's review, which a State is allowed to do by statute, the State "will not be able to file suit in the Claims Court until after the disallowance is recouped from a future quarterly payment." Id. at 906. The Bowen court explained that such delay for filing suit may not be ideal because a State has to plan ahead for its programs, and, therefore, a State may want to file suit "as promptly as possible," and seek "a motion for a preliminary injunction," following the Board's disallowance decision. See id. at 907. The Bowen court stated that "[a] district court has jurisdiction both to grant such relief and to do so while the funds are still on the State's side of the ledger," and that the "Claims Court can neither grant equitable relief," nor "act in any fashion so long as the Federal Government has not yet offset the disallowed amount from a future payment." Id.

Bowen, however, is inapplicable to the facts of the above-captioned case. As in NCMS, the focus in Bowen was whether the moving party's claim satisfied the jurisdictional analysis under the APA. Further, the claim at issue in Bowen was for "declaratory and injunctive relief" and did not stem from a contract between the moving party and the government. Contrastingly, the claim at issue in the above-captioned case seeks monetary damages and stems from a contract between the parties, the 2009 MTW Agreement.

Defendant, nonetheless, argues in its motion to dismiss that Bowen is instructive because:

> In Bowen, the Supreme Court drew a stark distinction between laws that "attempt to compensate a particular class of persons for past injuries or labors," which give rise to a remedy in money damages, and "the statutory mandate of a [F]ederal grant-in-aid program [that] directs the Secretary to pay money . . . not as compensation for a past wrong, but to subsidize future expenditures." The Court opined that Tucker Act jurisdiction over the latter type of law was unlikely.

(citation omitted). According to defendant, plaintiff in the above-captioned case is not seeking compensation for a past wrong but "in effect demands" Section 9 operating subsidies. The Bowen court, however, made the distinction between claims requesting

compensation for a past wrong and claims seeking reimbursement within the context of defining "money damages" under § 702 of the APA. Whether a claim seeks "money damages," as understood under § 702 of APA, and as the <u>Bowen</u> court itself acknowledged, is not dispositive of whether this court has jurisdiction over the same claim under the Tucker Act. The <u>Bowen</u> court stated:

> There are, of course, many statutory actions over which the Claims Court has jurisdiction that enforce a statutory mandate for the payment of money rather than obtain compensation for the Government's failure to so pay. The jurisdiction of the Claims Court, however, is not expressly limited to actions for "money damages," whereas that term does define the limits of the exception to § 702.

<u>Bowen v. Massachusetts</u>, 487 U.S. at 901 n.31 (internal references omitted). Furthermore, as previously noted, plaintiff in the above-captioned case is seeking compensation for a past wrong allegedly committed by HUD, not the repayment of Section 9 operating subsidies. As plaintiff's complaint alleges, plaintiff is seeking compensation in the amount of $2,874,719.00 in order to make up for the government's alleged past failure to comply with the terms of the 2009 MTW Agreement. Thus, contrary to defendant's position, <u>Bowen</u> does not assist the court in determining whether defendant has overcome the well-established presumption that monetary damages are available in a breach of contract claim.

<u>Interpretation of Section II.A of the 2009 MTW Agreement</u>

Defendant then argues that the presumption of monetary damages does not apply in this case because "any judicial interpretation of the undiminished assistance requirement" contained in Section II.A. of the 2009 MTW Agreement, "be it statutory or contractual—would constrain the 'cooperative, ongoing relationship between [SAHA] and [HUD] in the allocation and use of [Section 8 and Section 9] funds' for as long SAHA participates in the MTW demonstration." (alterations in original) (quoting <u>NCMS</u>, 114 F.3d at 201). According to defendant, "[c]onsequently, the Court cannot provide an *adequate* remedy under the Tucker Act for the alleged wrong in *this case*." (emphasis in original) (internal quotation marks omitted). Defendant also argues that the court's interpretation of the undiminished assistance provision "embodied in both the MTW Statute and SAHA's MTW Agreement," "would not only affect the prior payment of Section 9 subsidies disputed here, but would also constrain future payments of Section 8 and Section 9 subsidies that SAHA and other MTW demonstration participants might challenge later."

Plaintiff argues that "HUD's argument that an interpretation of the 'undiminished assistance' provision would affect the future relationship" is "groundless." In this case, plaintiff's disputes HUD's payment of Section 9 operating subsidies for 2012. According to plaintiff, "[t]he decision in this case would merely act as *res judicata* for this particular issue and not extend to other aspects of the agreement or the parties' future relationship." (emphasis in original).

Defendant's emphasis on the court's potential interpretation of the "undiminished assistance provision" contained at Section II.A of the 2009 MTW Agreement distorts the current issue before the court, which is whether this court has jurisdiction over plaintiff's breach of contract claim. The possible consideration of the court's interpretation of Section II.A of the 2009 MTW Agreement in the future does not answer the question of whether monetary damages are available under the 2009 MTW Agreement and whether jurisdiction for plaintiff's Count I is properly before this court. In this Opinion, the court is solely considering defendant's motion to dismiss. In addition, "the fact that the court may have to interpret an Act or make other determinations regarding principles of federal law in order to resolve the contract claim does not deprive the Court of Federal Claims of jurisdiction to decide that claim." Alvarado Hosp., LLC v. Price, 868 F.3d at 995 (noting that "[w]hether or not" the appellant was correct that determining the scope of the contract would require the court to interpret the Medicare Act and would require the parties to "compare" certain documents "does not remove jurisdiction from the Court of Federal Claims"); see also Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1367 (Fed. Cir. 1998) (noting "the fact that the court may have to interpret the Tribal Consent Act or make other determinations regarding principles of state and federal law in order to resolve the contract claim does not deprive the court [of Federal Claims] of jurisdiction to decided that claim"). Therefore, even if the court were required to interpret Section II.A of the 2009 MTW Agreement in the future, the court's interpretation of this contract provision does not make it improper for plaintiff to pursue its breach of contract claim in this court's jurisdiction.

Furthermore, defendant's concern that this court's interpretation of Section II.A of the 2009 MTW Agreement would affect the ongoing relationship between HUD and plaintiff is misguided. Plaintiff's breach of contract claim seeks damages related to the government's allegedly wrongful underpayment of Section 9 operating subsidies for 2012. Plaintiff does not allege in its complaint in the above-captioned case that the government has acted wrongfully following 2012. The issue before the court is whether the government breached the 2009 MTW Agreement only in 2012. Contrary to defendant's position, the court's resolution of plaintiff's breach of contract claim would not "constrain" the ongoing relationship between HUD and plaintiff.

<u>Jurisdiction over Non-Commercial Contracts</u>

Defendant argues that the presumption of monetary damages should not apply to the 2009 MTW Agreement because it is not the "'kind of'" contract that "'comes within the core of the strong background rule making monetary remedies available for contract breaches even when there is no express contract provision so stating.'" (quoting Rocky Mountain Helium, LLC v. United States, 841 F.3d at 1327). Again, quoting Rocky Mountain Helium, LLC v. United States, 841 F.3d at 1327, defendant argues that the "MTW Agreement concerns the administration of public benefits and cannot fairly be characterized as 'a commercial contract' that concerns 'a commercial arrangement.'" According to defendant, the 2009 MTW Agreement instead is "more akin" to a cooperative agreement pursuant to 31 U.S.C. § 6305 (2018), a statute regarding the executive branch's use of cooperative agreements and which constitutes part of the Federal Grant

and Cooperative Agreement Act of 1997 (FGCAA), codified at 31 U.S.C. § 6301 et seq. (2018). According to defendant, "this Court has recognized that a presumption of money damages does not apply to cooperative agreements." Plaintiff, however, argues that the government "cannot get around the presumption that money damages are available for a breach-of-contract claim such as SAHA's," and that "[n]one of the narrow exceptions to this presumption" apply to this case. According to plaintiff, "the MTW Agreement is a valid and enforceable contract between SAHA and HUD, the breach of which fairly contemplates money damages." Plaintiff further argues that defendant's "attempt to analogize this case with 'cooperative agreements' is entirely misplaced and does not rebut the presumption that money damages are available for HUD's breach of the MTW Agreement."

Defendant's reliance on Rocky Mountain Helium for its argument that 2009 MTW Agreement is a non-commercial contract, and, therefore, outside of this court's jurisdiction, is misplaced. In Rocky Mountain Helium, Rocky Mountain Helium, LLC, the plaintiff, brought a breach of contract claim based on a settlement agreement it had entered into with the United States Bureau of Land Management (Bureau), which had settled a prior dispute between plaintiff and the Bureau regarding a helium contract under which plaintiff was allowed to extract helium from federal land in exchange for paying the government rent or a royalty for the extracted helium. See Rocky Mountain Helium, LLC v. United States, 841 F.3d at 1321-22. Pursuant to the settlement agreement, the government was to provide Rocky Mountain Helium with certain "Data" about gas composition on the federal lands covered by the helium contract, and within 90 days of receiving the Data, Rocky Mountain Helium was obligated to pay the government $116,579.90 in back rent, at which point the helium contract would be reinstated. See id. at 1322. The settlement agreement explained that if Rocky Mountain Helium failed to make payment to the government within 90 days of receipt of the Data, Rocky Mountain Helium's failure to pay would trigger a "Sunset Provision," which provided that the Bureau could contract with third parties for helium recovery on the lands covered by the helium contract. See id. The settlement agreement also contained a disputes clause, which provided that any disputes between the parties regarding the settlement agreement "will be submitted to the Honorable Judge Allan Goodman at the CBCA [Civilian Board of Contract Appeals] for ADR [Alternative Dispute Resolution] pursuant to CBCA rule 54." See id. (second alteration in original; internal quotation marks omitted).

Giving rise to Rocky Mountain Helium's breach of contract claim in the United States Court of Federal Claims was the government's decision to invoke the Sunset Provision. See id. at 1326. According to Rocky Mountain Helium, the government allegedly had breached the settlement agreement when it improperly invoked the Sunset Provision based on Rocky Mountain Helium's failure to pay $116,579.90 within 90 days, as required by the settlement agreement. See id. Rocky Mountain Helium did not dispute that it had not paid the government, but, instead, argued that it was not required to do so because the government provided it with incomplete Data, and, thus, the government's invocation of the Sunset Provision was allegedly improper. See id. The United States Court of Federal Claims dismissed Rocky Mountain Helium's breach of a settlement agreement claim for "lack of subject matter jurisdiction on the ground that the disputes

clause required submission of the dispute to Judge Goodman." Id. On appeal, the parties conceded that Rocky Mountain Helium did submit its dispute to Judge Goodman, and, thus, the disputes clause was satisfied. See id. The government argued that jurisdiction was nonetheless lacking on Rocky Mountain Helium's breach of contract claim because the settlement agreement could not be fairly interpreted as mandating monetary damages by the government. See id. at 1326-27. The United States Court of Appeals for the Federal Circuit "reject[ed] that contention" and explained that "'as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach,'" which applies absent specific and limited circumstances, which the Federal Circuit noted did not apply in the case. See id. at 1327 (quoting Sanders v. United States, 252 F.3d at 1334). The United States Court of Appeals for the Federal Circuit then stated that the settlement agreement "is a commercial contract" that "comes within the core of the strong background rule making monetary remedies available for contract breaches even when there is no express contract provision so stating." Id. Although the United States Court of Appeals for the Federal Circuit noted that the settlement agreement in Rocky Mountain Helium was a commercial contract, the Rocky Mountain Helium court did not find that commercial contracts were the only contracts under the United States Court of Federal Claim's jurisdiction. On the contrary, the Federal Circuit in Rocky Mountain Helium noted that, unless a contract falls within one of the "limited number of situations,"[10] in which money damages are not available under a contract, a contract will be presumed to provide monetary damages, "even when there is no express contract provision so stating." See id. Therefore, contrary to defendant's argument, whether plaintiff's 2009 MTW Agreement can be considered a "commercial contract" is not dispositive to this court's jurisdictional analysis.

Jurisdiction over a Cooperative Agreement

Defendant argues that the 2009 MTW Agreement falls outside of this court's jurisdiction because it is "akin" to a cooperative agreement pursuant to the FGCAA. The FGCAA provides guidance to executive agencies regarding the use of three different legal instruments, a "procurement" contract, a "grant agreement," and a "cooperative" agreement. See 31 U.S.C. §§ 6303-6305. The stated "purposes" of the FGCAA is (1) to "promote a better understanding of United States Government expenditures and help eliminate unnecessary administrative requirements on recipients of Government awards," (2) "prescribe criteria for executive agencies in selecting appropriate legal instruments" to achieve "uniformity in their use by executive agencies," "a clear definition of the relationships they reflect," and a "better understanding of the responsibilities of the parties to them," and (3) "promote increased discipline in selecting and using procurement contracts, grant agreements, and cooperative agreements." Id. at § 6301. The FGCAA

---

[10] As previously discussed, the limited number of situations recognized by the Rocky Mountain Helium court were "where a contract expressly disavows money damages," "where the breach alleged was of a confidentiality provision in an agreement defining the terms of an alternative dispute resolution process," "where the agreement concerned a criminal defendant's release on bail," and "where a special government cost-sharing agreement, rather than a procurement or sales contract, was at issue." Id.

provision to which defendant cites, 31 U.S.C. § 6305, is titled "Using cooperative agreements." The statute at 31 U.S.C. § 6305 provides:

> An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when--
> > (1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and
> > (2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

Id. This section of the FGCAA provides guidance to federal agencies as to when a cooperative agreement may be an appropriate vehicle to suit their needs.

In Trauma Service Group v. United States, 104 F.3d 1321 (Fed. Cir. 1997), the United States Court of Appeals for the Federal Circuit noted that a contract's classification as a cooperative agreement does not determine whether the United States Court of Federal Claims has jurisdiction over a breach of contract claim. See id. at 1326. In Trauma Service Group, Trauma Service Group, a civilian provider of health care services, brought a breach of contract claim against the government, alleging that the United States Army had breached its memorandum of agreement (MOA) with Trauma Service Group, which provided for the sharing of resources between health care facilities for the military and health care facilities for civilians. See Trauma Serv. Grp. v. United States, 104 F.3d at 1323-24. The United States Court of Federal Claims dismissed Trauma Service Group's breach of contract claim, finding in part that Trauma Service Group's MOA agreement was a "cooperative agreement" pursuant to the FGCAA and, thus, not enforceable in this court. See Trauma Serv. Grp. v. United States, 33 Fed. Cl. 426, 429-30 (1995), aff'd on other grounds, 104 F.3d 1321 (Fed. Cir. 1997). On appeal, the United States Court of Appeals for the Federal Circuit affirmed the trial court's dismissal of the breach of contract claim, but on different grounds. See Trauma Serv. Grp. v. United States, 104 F.3d 1326. The Federal Circuit found that Trauma Service Group had failed to prove there was a breach, not that the appellant lacked an enforceable contract. See id. The United States Court of Appeals for the Federal Circuit noted that "any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government," and, therefore, "contrary to the opinion of the trial court, a MOA [memorandum of agreement] can also be a contract—whether this one is, we do not decide." Id.

Furthermore, as a Judge of this court explained in <u>Thermalon Industries, Limited v. United States</u>, 34 Fed. Cl. 411 (1995), the FGCAA's classification of legal instruments into "procurement contracts," "cooperative agreements," and "grant agreements" is not dispositive when determining Tucker Act jurisdiction over a potential breach of contract claim pursuant to 28 U.S.C. § 1491(a). <u>See Thermalon Indus., Ltd. v. United States</u>, 34 Fed. Cl. at 419. In <u>Thermalon</u>, defendant argued that this court lacked subject matter jurisdiction pursuant to the Tucker Act over plaintiff's grant agreement because the <u>Thermalon</u> plaintiff's grant agreement, as defined by the FGCAA, was not a contract involving the "government's proprietary procurement of goods and services." <u>Id.</u> at 417. The <u>Thermalon</u> court, however, rejected defendant's contention that grant agreements, <u>per se</u>, fell outside of this court's Tucker Act jurisdiction, stating:

> These and the other provisions of the Grant Act do not aid defendant because they do not address even obliquely the scope of this court's Tucker Act contract jurisdiction. There is no suggestion in the Grant Act that procurement contracts are the only type of contracts enforceable under the Tucker Act or that grant agreements that satisfy all of the ordinary requirements for a government contract should not be classified as contracts enforceable under the Tucker Act. In this regard, Congress' use of the word "contract" when referring to procurement contracts and of the word "agreement" when referring to grant agreements does not suggest that all grant agreements are not contracts. To the contrary, as explained in the <u>Restatement (Second) of Contracts</u> § 3 cmt. a (1979), "[a]greement has in some respects a wider meaning than contract, bargain or promise. . . . The word 'agreement' contains no implication that legal consequences are or are not produced." In other words, "agreement" is broader in scope than "contract" in that agreements encompass both contracts, <u>see</u>, <u>e.g.</u>, <u>County of Suffolk, N.Y. v. United States</u>, 19 Cl. Ct. 295, 297 (1990) ("[g]iven the existence of an offer, acceptance, and consideration, the two grant agreements . . . constitute enforceable contracts"), and arrangements that do not qualify as contracts, <u>see</u>, <u>e.g.</u>, <u>D.R. Smalley [& Sons, Inc. v. United States]</u>, 178 Ct. Cl. [593, 598], 372 F.2d [505, 507 (1967)] (holding certain federal grants of highway funds to be "gifts or gratuities"). Therefore, Congress' use of the term "agreement" in the Grant Act to describe a grant relationship cannot reasonably be interpreted as an indication that Congress intended for all grant agreements not to constitute contracts and to fall outside the scope of this court's Tucker Act jurisdiction.

<u>Thermalon Indus., Ltd. v. United States</u>, 34 Fed. Cl. at 417-18. The <u>Thermalon</u> court then stated:

> [T]he classification of an arrangement with the United States as a grant agreement does not resolve the question of whether the arrangement constitutes a contract enforceable under the Tucker Act. The answer to that question is not found in the Grant Act but rather in the standards traditionally

applied by this court requiring a mutual intent to contract, including an offer,
acceptance, and consideration.

Id. at 419.

Since the issuance of Trauma Service and Thermalon, a number of Judges of this
court have noted that a contract's classification as a cooperative or grant agreement does
not determine whether this court has jurisdiction over a party's breach of contract claim.
See, e.g., 360Training.com, Inc. v. United States, 104 Fed. Cl. 575, 587 (2012) ("[T]he
FGCAA is directed to a different set of concerns than the Tucker Act. The FGCAA sets
criteria that an agency should evaluate when deciding which legal instrument best
represents the relationship between two parties, while the Tucker Act provides for
jurisdiction over a procurement or a proposed procurement, which encompasses the
entire process of obtaining property or services from a third party. The Court, therefore,
finds that the descriptions of procurement contracts and cooperative agreements
contained in 31 U.S.C. § 6303 and § 6305 do not narrow the definition of procurement in
the Tucker Act . . . ." (citation omitted)); Pa. Dep't of Public Welfare v. United States, 48
Fed. Cl. 785, 790 (2001) (noting that it "is not this Court's position that grants can never
be contracts within Tucker Act jurisdiction," and that "[g]rant related agreements have
been held to be contracts within Tucker Act jurisdiction when all the requisite elements of
a contract were present"); Moore v. United States, 48 Fed. Cl. 394, 397 (2000) (noting
that "this court and its predecessor have also concluded that jurisdiction lies under the
Tucker Act to consider alleged breaches of grants or cooperative agreements"), appeal
dismissed, 17 F. App'x 973 (Fed. Cir. 2001).

Defendant in the above-captioned case cites to St. Bernard Parish Government v.
United States, 134 Fed. Cl. 730 (2017), aff'd on other grounds,[11] 916 F.3d 987 (Fed. Cir.
2019), and Anchorage v. United States, 119 Fed. Cl. 709 (2015), two cases issued by the
same Judge of this court, to support defendant's position that cooperative agreements
are afforded no presumption of money damages. This court is not bound by decisions
issued by Judges of this court but only by decisions issued by the United States Court of
Claims, this court's predecessor, the United States Court of Appeals for the Federal
Circuit, and the United States Supreme Court. See Dellew Corp. v. United States, 855
F.3d 1375, 1382 (Fed. Cir. 2017); see also Coltec Indus., Inc. v. United States, 454 F.3d
1340, 1353 (Fed. Cir.) ("There can be no question that the Court of Federal Claims is
required to follow the precedent of the Supreme Court, our court, and our predecessor
court, the Court of Claims."), reh'g denied (Fed. Cir. 2006), cert. denied, 549 U.S. 1206

---

[11] On appeal, the Federal Circuit in St. Bernard Parish Government noted that "[w]e do
not reach" the issue of whether the "trial court erroneously concluded that the agreement
between St. Bernard and the NRCS was not a binding contract enforceable in money
damages," because "we conclude that Congress has barred claims such as St. Bernard's
from being adjudicated in the Court of Federal Claims, and instead has provided for such
claims to be addressed first in administrative review proceedings before the Department
of Agriculture." St. Bernard Parish Gov't v. United States, 916 F.3d 987, 991 (Fed. Cir.
2019).

(2007). Further, the position summarily articulated in <u>St. Bernard Parish</u> that cooperative agreements are not afforded a presumption of monetary damages is not persuasive. <u>See</u> <u>St. Bernard Parish Gov't v. United States</u>, 134 Fed. Cl. at 735 (holding that because the agreement at issue was a "cooperative agreement" pursuant to the FGCAA, "damages cannot be implied"). The decision does not cite to any legal support that cooperative agreements, as defined by the FGCAA, are <u>per se</u> outside of this court's jurisdiction under 28 U.S.C. § 1491(a). In addition, <u>St. Bernard Parish</u> does not discuss the United States Court of Appeals for the Federal Circuit's explanation in <u>Trauma Service Group</u> that any contract, including a cooperative agreement, could fall within this court's jurisdiction so long as the contract contains the four required elements of offer, acceptance, consideration, and proper government authority. <u>See</u> <u>Trauma Serv. Grp. v. United States</u>, 104 F.3d at 1326. Therefore, <u>St. Bernard Parish</u> does not alter this court's conclusion that cooperative agreements are not categorically excluded from this court's jurisdiction.

In <u>Anchorage</u>, the defendant argued that the plaintiff's contract was a cooperative agreement "under the Federal Grant and Cooperative Agreement Act ('FGCAA')," and, therefore, "money damages are not presumed in a cooperative agreement," similar to the argument defendant raises in the above-captioned case. <u>See</u> <u>Anchorage v. United States</u>, 119 Fed. Cl. at 713. The <u>Anchorage</u> court, however, did not address whether cooperative agreements, as defined by the FGCAA, fell outside of this court's jurisdiction but instead focused on whether plaintiff's contract could qualify as a cooperative agreement, which the court found was not the case. <u>See id.</u> at 714. Therefore, <u>Anchorage</u> did not reach the issue of whether cooperative agreements are <u>per se</u> outside of this court's jurisdiction.

Defendant also claims that the Judge in <u>Summit Power Group, LLC v. United States</u>, 139 Fed. Cl. 369 (2018), "recognized that a presumption of money damages does not apply to cooperative agreements." The Judge in <u>Summit Power</u>, however, did not state that cooperative agreements never receive a presumption of monetary damages, but noted that Judges of this court and of the United States Court of Appeals for the Federal Circuit have found that "particular" cooperative agreements, which "did not contemplate payment of money as a remedy for breach of the agreement," fell outside of this court's jurisdiction. <u>See id.</u> at 374. In addition, the <u>Summit Power</u> court did not address whether the plaintiffs' cooperative agreement contemplated monetary damages and instead found that the plaintiffs' cooperative agreement failed to come within this court's jurisdiction because plaintiffs sought declaratory relief, not monetary relief.  <u>See id.</u> at 374-75. As the <u>Summit Power</u> court stated:

> More importantly, however, even if plaintiffs are correct that the cooperative agreement is a contract to which they are parties, and even if the cooperative agreement contemplated damages for breach, plaintiffs do not seek such relief. They do not seek money damages as a result of breach of the implied duty of good faith and fair dealing. Instead, they seek a declaration that such breach excused STCE's [Summit Texas Clean Energy, LLC] failure to reach financial close and as a result DOE [the Department of Energy] should be precluded from seeking repayment of the accelerated funds.

Id. at 374.

Defendant then claims that <u>Rick's Mushroom Service, Inc. v. United States</u> supports its proposition that a presumption of money damages is not available under a cooperative agreement. <u>Rick's Mushroom</u>, however, is distinguishable from the above-captioned case. In <u>Rick's Mushroom</u>, the issue before the United States Court of Appeals for the Federal Circuit was whether appellant's cost-sharing, cooperative agreement with the government for implementing conservation practices in a facility for recycling of mushroom waste qualified as a "procurement" contract for purposes of establishing jurisdiction under 28 U.S.C. § 1491(a)(2), which allows this court to render judgment upon a claim under the CDA. <u>See Rick's Mushroom Serv., Inc. v. United States</u>, 521 F.3d at 1343. The Federal Circuit noted that the CDA applies only to "express or implied government contracts for procurement of goods or services." <u>Id.</u> (citing 41 U.S.C. § 602(a) (2006), codified as amended at 41 U.S.C. §§ 7101-09 (2012)). Therefore, for the United States Court of Appeals for the Federal Circuit to find jurisdiction over the <u>Rick's Mushroom</u> appellant's contract claim under 28 U.S.C. § 1491(a)(2), the cost-sharing, cooperative agreement had to qualify as a "procurement" contract. <u>See Rick's Mushroom Serv., Inc. v. United States</u>, 521 F.3d at 1344. The United States Court of Appeals for the Federal Circuit determined that the appellant's contract did not classify as a procurement contract and, therefore, there was no basis for jurisdiction under 28 U.S.C. § 1491(a)(2). <u>See id.</u> Plaintiff in the above-captioned case, however, is not alleging jurisdiction under 28 U.S.C. § 1491(a)(2) nor has plaintiff alleged that its 2009 MTW Agreement is a procurement contract, but alleges that jurisdiction arises under 28 U.S.C. § 1491(a)(1), the Tucker Act's general contract claim jurisdiction, which is not limited to only procurement contracts but more broadly to any contract claims. <u>Rick's Mushroom</u> does not assist defendant's argument that plaintiff's breach of contract claim rests outside of this court's 28 U.S.C. § 1491(a)(1) jurisdiction.[12]

---

[12] The Federal Circuit in <u>Rick's Mushroom</u> summarily stated in one sentence, without providing any legal analysis or citing to any legal support, that the appellant's "the cost-share agreement does not provide a substantive right to recover money-damages and Rick's does not point to a money-mandating source of law to establish jurisdiction under 28 U.S.C. § 1491(a)(1) for its breach of contract claim." <u>Rick's Mushroom Serv., Inc. v. United States</u>, 521 F.3d at 1343. Contrary to defendant's position in this case, the Federal Circuit's finding that the <u>Rick's Mushroom</u> appellant's cost-sharing agreement did not provide a right to recovery under 28 U.S.C. § 1491(a)(1) does not translate into a blanket rule that all cooperative agreements fall outside of this court's 28 U.S.C. § 1491(a)(1) jurisdiction, nor has it been so broadly applied by the Federal Circuit in subsequent decisions. As the Federal Circuit noted in <u>Rocky Mountain Helium</u>, issued eight years after <u>Rick's Mushroom</u>, the "special government cost-sharing agreement" at issue in <u>Rick's Mushroom</u>, rather than all cost-sharing agreements, fell outside of this court's jurisdiction. <u>See Rocky Mountain Helium, LLC v. United States</u>, 841 F.3d at 1327 (citing <u>Rick's Mushroom Serv., Inc. v. United States</u>, 521 F.3d at 1344-46).

Incorporation of a Non-Money Mandating Statue

Defendant then argues that no presumption of monetary damages should apply to the 2009 MTW Agreement because the agreement incorporates, and relies on, the 2012 Appropriations Act and the MTW Statute, two statutes which defendant argues are not money-mandating. Defendant argues in its reply in support of its motion to dismiss:

> Here, SAHA only nominally relies on the existence of a contract; in substance, its claims depend upon the 2012 Appropriations Act and the MTW Statute to establish the parameters of those claims. To the extent that those non-money-mandating statutory duties may have been replicated or incorporated into SAHA's contract with HUD, the contract merely reflects SAHA's enrollment in, and adherence to, a larger statutory and regulatory scheme that is not itself money-mandating. Accordingly, any and all contractual promises under the MTW agreement are animated by—and must be interpreted in light of—the limitations of those laws. Those limitations, in turn, are fatal to SAHA's demand for "damages."

(internal reference omitted). Defendant also states that "when a contract-based entitlement derives wholly from statute, a claim based on that contract provision must succumb to the very same flaws as the statute embodied by that contract provision."

Plaintiff argues that "the question of whether the MTW Statute and 2012 Appropriations Act are or are not money-mandating is not relevant to the question of whether SAHA's breach-of-contract claim can fairly be interpreted as contemplating monetary damages in the event of breach." (internal quotation marks omitted). According to plaintiff, "the nature of SAHA's breach-of-contract claim is one for compensatory money damages" and brings "SAHA's claim within the jurisdiction of the Tucker Act."

Plaintiff in this case does not allege that defendant breached any portion of plaintiff's 2009 MTW Agreement which incorporates the 2012 Appropriations Act. Count I, instead, alleges that defendant breached Section II.A of the 2009 MTW Agreement, which contains a subsection that largely tracks the "Anti-Discrimination Provision" contained in Section (f) of the MTW Statute, contained within the Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1996, Pub. L. No. 104-134, § 204, 110 Stat. 1321, 1321-281 (1996). Defendant's allegation that the 2009 MTW Agreement incorporates the 2012 Appropriations Act is inapposite to the issue at hand, which is whether the 2009 MTW Agreement is money-mandating.

Regarding the 2009 MTW Agreement's incorporation of the MTW Statute, Count I alleges that that defendant breached the "Anti-Discrimination Provision in Section II.A of the MTW Agreement by reducing SAHA's operating subsidy" solely "because SAHA is a MTW agency." According to the complaint, Section II.A of the 2009 MTW Agreement largely tracks the language contained in Section (f) of the MTW Statute. The complaint states:

Section II.A of the MTW Agreement between HUD and SAHA recites almost verbatim the MTW Act's Anti-Discrimination Provision, providing: "The amount of assistance received under sections 8 or 9 of the 1937 Act by an Agency participating in the demonstration **_shall not be diminished_** by the Agency's participation in the MTW demonstration."

The Anti-Discrimination Provisions in both the MTW Act and MTW Agreement provide a clear, non-discretionary standard for the minimum payment of subsidies to MTW agencies such as SAHA under Sections 8 and 9. Consequently, the Anti-Discrimination Provision [within the MTW Agreement] is money mandating.

(emphasis in original; internal reference omitted). The complaint alleges that, "[a]s a result of HUD's breach of the MTW Agreement, SAHA was damaged in the amount of at least $2,874,719 and is entitled to recover same."

Whether the 2009 MTW Agreement explicitly incorporates Section (f) of the MTW Statute, however, does not affect this court's analysis of whether jurisdiction exists over plaintiff's breach of contract claim. As the Federal Circuit noted in San Juan City College v. United States, 391 F.3d 1357 (Fed. Cir. 2004), a case cited to by both parties in this case, an agreement's incorporation of allegedly non-monetary regulations is not jurisdictionally fatal to the plaintiff's breach of contract claim. See San Juan City College v. United States, 391 F.3d at 1360. In San Juan City College, the San Juan City College sued the United States Department of Education (DOE) in the United States Court of Federal Claims, alleging that the DOE breached its program participation agreement with San Juan City College, which provided that the government would provide student aid funds to San Juan City College. See id. at 1357-58. San Juan City College alleged that the breach occurred in 1995, when the government failed to provide it with a hearing before ceasing student aid funding, which was required pursuant to 34 C.F.R. § 668.86 (1995), a regulation that was incorporated into the program participation agreement. See id. at 1359. The United States Court of Federal Claims initially had found that the breach of contract claim failed and granted defendant's motion for summary judgment, explaining that "[t]he agency's commitment, in short, was to do what the regulations required. The regulations, however, embody their own limited remedy for 'breach'-namely, either an administrative appeal, as provided for in 34 C.F.R. § 668.111–121, or a suit in the district court seeking declaratory or injunctive relief." San Juan City Coll. v. United States, 58 Fed. Cl. 26, 31 (2003), rev'd, 391 F.3d 1357 (Fed. Cir. 2004). The United States Court of Federal Claims then stated that "[w]e rule that, as a matter of law, violation of the agreement, insofar as it involves a failure to offer a hearing under 34 C.F.R. § 668.86, creates a right only to equitable relief," and, thus, San Juan City College was not entitled to any contractual monetary damages. See id. at 32.

The United States Court of Appeals for the Federal Circuit, however, reversed the United States Court of Federal Claims, explaining:

Although it may well be, as the Court of Federal Claims stated, that most (and perhaps all) of these contractual provisions were required by and incorporated the governing regulations, that does not make them any less contractual obligations or provisions, or constitute a valid reason for not treating them as such.

We see nothing in either the Agreement itself or in the governing statute or regulations that supports the Court of Federal Claims' view that the parties understood that damages would not be available in the event of breach. Normally contracts do not contain provisions specifying the basis for the award of damages in case of breach, with the exception of provisions governing damages in particular situations, such as liquidated damages for delay or other specified breaches.

The fact that this contract covers government financial grants does not warrant a different standard. If the government has breached the Agreement, the College is entitled to seek whatever damages it is entitled to receive. As this Court has stated, "in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement. Indeed, as a plurality of the Supreme Court noted in <u>United States v. Winstar Corp.</u>, 518 U.S. 839, 116 S. Ct. 2432, 135 L. Ed. 2d 964 (1996), 'damages are always the default remedy for breach of contract.'" <u>Sanders v. United States</u>, 252 F.3d 1329, 1334 (Fed. Cir. 2001) (citing and quoting <u>Winstar Corp.</u>, 518 U.S. at 885, 116 S. Ct. 2432 (parallel citations omitted)).

<u>San Juan City Coll. v. United States</u>, 391 F.3d at 1360-61. Therefore, as the Federal Circuit held in <u>San Juan City College</u>, a contract's incorporation of allegedly non-money mandating statutory and regulatory provisions does not prevent this court from exercising jurisdiction over a breach of contract claim. <u>See</u> <u>id.</u> Defendant's argument that this court lacks jurisdiction over the 2009 MTW Agreement due to its incorporation of the MTW Statute fails.

<u>Request for New Exception to Presumption of Monetary Damages</u>

Finally, defendant argues that, "even if the presumption of damages did apply," the court should make an exception to this presumption for plaintiff's 2009 MTW Agreement. Defendant, however, provides no relevant support for this argument. Defendant simply states that "[s]olicitude for previously recognized judge-made exceptions to a judge-made presumption should not stunt the development of decisional law as courts continue to confront different types of Government agreements." (citation omitted). The court declines defendant's invitation to exclude plaintiff's 2009 MTW Agreement from this court's well-developed contract jurisdiction. To summarize, the well-established presumption that monetary damages are available in a breach of contract claim applies to the facts of the above-captioned case. Defendant's numerous arguments that the presumption should not apply in this case fail. Defendant has not overcome this presumption, and, therefore,

the court denies defendant's motion to dismiss for lack of subject matter jurisdiction plaintiff's breach of contract claim. Whether and to what extent plaintiff may recover $2,874,719.00 under its breach of contract claim is a determination on the merits, which the court does not reach on this motion to dismiss for lack of subject matter jurisdiction. See Alvarado Hospital, LLC v. Price, 868 F.3d at 993 ("'Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.'" (alterations in original) (quoting Do-Well Mach. Shop, Inc. v. United States, 870 F.2d 637, 639 (Fed. Cir. 1989))).

As previously noted, plaintiff argues that because Judges of this court in Boaz, Public Housing Authorities Directors Association, and Santa Clara previously found that HUD had breached public housing contracts between HUD and various public housing authorities, this court should find that plaintiff's 2009 MTW Agreement falls within this court's jurisdiction. As stated above, this court is not bound by the decisions of other Judges of this court but is only strictly bound by decisions issued by the United States Court of Claims, this court's predecessor court, the United States Court of Appeals for the Federal Circuit, and the United States Supreme Court. See Dellew Corp. v. United States, 855 F.3d at 1382 (noting that "the Court of Federal Claims must follow relevant decisions of the Supreme Court and the Federal Circuit").

In Santa Clara, the government entered into two separate MTW agreements with two separate public housing agencies. See Housing Authority of Santa Clara v. United States, 125 Fed. Cl. at 562. The Santa Clara plaintiffs alleged in their two-count complaint that (1) the government breached their 2008 MTW agreements beginning in 2008 due to the government's alleged underfunding of plaintiffs' Section 8 "housing assistance payments" subsidy in violation of Attachment A of the 2008 MTW Agreement, and (2) the government continued to breach their contract in "2009 through 2012." See id. at 561-62 (internal quotations marks omitted). The parties did not contest the court's jurisdiction over plaintiff's two breach of contract claims. The court, without any jurisdictional analysis as to whether the Santa Clara plaintiffs' 2008 MTW Agreement provided a monetary remedy, summarily concluded in passing that the court had jurisdiction over plaintiffs' breach of contract claims. See id. at 562.

In Public Housing Authorities Directors Association, the lead case of various consolidated cases brought by over three hundred public housing agencies before Judge Kaplan, the Public Housing Authorities Directors Association plaintiffs alleged a breach of "Annual Contributions Contracts" when the government offset public housing agencies' Section 9 operating subsidies in 2012 with the plaintiffs' operating reserves pursuant to the 2012 Appropriations Act. See Pub. Hous. Auths. Dirs. Ass'n. v. United States, 130 Fed. Cl. at 529. According to the Public Housing Authorities Directors Association plaintiffs, the government was required by 24 C.F.R. § 990.201(c), a regulation incorporated into the plaintiffs' annual contribution contracts, in the event of insufficient funds, to reduce "'on a pro rata basis, the amounts of operating subsidy to be paid to PHAs.'" Id. at 526 (quoting 24 C.F.R. § 990.201(c)). The government, however, pursuant to the 2012 Appropriations Act, offset public housing authorities' Section 9 operating subsidy for 2012 with public housing authorities' excess operating reserves. See id. at

529. The government also challenged the court's jurisdiction over some of the plaintiffs, alleging that sixteen of the three hundred plaintiffs did not have standing because, according to the government, the sixteen plaintiffs did not suffer any injury-in-fact. The government did not challenge whether the plaintiffs' annual contribution contract created a money-mandating remedy to support jurisdiction over the plaintiffs' breach of contract claim. The <u>Public Housing Authorities Directors Association</u> court found in favor of the government's jurisdictional argument, explaining that because the thirteen plaintiffs did not have any operating reserves for 2012, the thirteen plaintiffs did not experience an operating reserve offset in 2012, and, therefore, lacked standing to bring a breach of contract claim. <u>See id.</u> at 530.

In <u>Boaz</u>, over five hundred public housing agencies sued HUD for a breach of their annual contribution contracts when the government offset public housing agencies' Section 9 operating subsidies in 2012 with the plaintiffs' operating reserves pursuant to the 2012 Appropriations Act. <u>See Boaz Hous. Auth. v. United States</u>, 141 Fed. Cl. at 79. Judge Kaplan presided over the <u>Boaz</u> case and noted that the "legal claims" and "[t]he issues before the Court on the merits of this case are identical" to those that were before Judge Kaplan in <u>Public Housing Authorities Directors Association</u>, discussed above. <u>See id.</u> at 76. Unlike in <u>Public Housing Authorities Directors Association</u>, however, the government in <u>Boaz</u> did not challenge the standing of a few plaintiffs, but claimed that the plaintiffs' annual contribution contracts did not provide a monetary remedy and, thus, fell, outside of this court's jurisdiction. <u>See id.</u> at 80. The <u>Boaz</u> court rejected the government's position, finding that the plaintiffs' annual contribution contracts enjoyed the benefit of the presumption that money damages are available in a breach of contract claim in this court and fell within this court's jurisdiction. <u>See id.</u> at 80-84.

Although the Judges in <u>Boaz</u>, <u>Public Housing Authorities Directors Association</u>, and <u>Santa Clara</u> did not present an in-depth analysis of this court's jurisdiction over a breach of contract claim stemming from a MTW Agreement, the court finds these three cases are persuasive and support this court's conclusion that plaintiff's breach of contract claim regarding its 2009 MTW Agreement with HUD falls within this court's jurisdiction. In sum, plaintiff's 2009 MTW Agreement does not fall within one of the few exceptions to this court's well-established presumption that monetary damages are available for breach of contract claims. Further, defendant has not sufficiently rebutted the presumption that monetary damages apply to plaintiff's 2009 MTW Agreement, nor has defendant presented any reason for why plaintiff's 2009 MTW Agreement should be excluded from this court's jurisdiction. Therefore, defendant's motion to dismiss Count I of the complaint for lack of subject matter jurisdiction is denied.

In addition to arguing that Count I should be dismissed for lack of subject matter jurisdiction, defendant also argues that Count I should be dismissed pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief may be granted. According to defendant, this court cannot award plaintiff damages because plaintiff "was only ever entitled to strings-attached funds," and that "a free-and-clear transfer of money would exceed SAHA's underlying entitlement, making it more than 'whole' for HUD's alleged wrongdoing." Defendant also argues that "SAHA cannot be said to have suffered any

'direct damages' as a result of HUD's alleged underpayment." According to defendant, "[a]lthough HUD did not pay SAHA the additional money that SAHA claims it should have received, SAHA in turn was not required to spend that additional money to fulfill its obligations to HUD under the MTW Agreement." Defendant states that, "SAHA therefore has not plausibly alleged an entitlement to the amount of subsidy SAHA would have received had HUD not breached the agreement because HUD's alleged underpayment could not (and did not) deny SAHA the benefit of its bargain with HUD[.]" (brackets in original) (internal quotation marks omitted).

Plaintiff, however, argues that Count I "present[s] a plausible claim for compensatory monetary damages that are within this Court's jurisdiction to award and that would not require any additional equitable or injunctive relief due to the contract between the parties governing the use of any such funds." Plaintiff argues that its breach of contract claim therefore "meet[s] the Rule 12(b)(6) standard and should not be dismissed on that basis."

In examining what must be pled in order to state a claim, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2018); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Supreme Court has stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl.

Corp. v. Twombly, 550 U.S. at 555-57, 570); Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 562 U.S. 830 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009); Christen v. United States, 133 Fed. Cl. 226, 229 (2017); Christian v. United States, 131 Fed. Cl. 134, 144 (2017); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Hous. Corp. v. United States, 113 Fed. Cl. 244, 253 (2013), aff'd, 579 F. App'x 1004 (Fed. Cir. 2014); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726-27 (2010), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011); Legal Aid Soc'y of N.Y. v. United States, 92 Fed. Cl. 285, 292, 298 n.14 (2010).

When deciding a case based on a failure to state a claim, the court "must accept as true the factual allegations in the complaint." Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1355 (Fed. Cir. 2011); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. at 508 n.1))); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); Harris v. United States, 868 F.3d 1376, 1379 (Fed. Cir. 2017) (citing Call Henry, Inc. v. United States, 855 F.3d 1348, 1354 (Fed. Cir. 2017)); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

"'Contract interpretation is a matter of law and thus may be addressed by the Court

in resolving a motion to dismiss.'" <u>Bell/Heery v. United States</u>, 739 F.3d at 1330 (quoting <u>S. Cal. Edison v. United States</u>, 58 Fed. Cl. 313, 321 (2003)); <u>see</u> <u>also</u> <u>Canpro Invs. Ltd. v. United States</u>, 130 Fed. Cl. 320, 347, <u>recons.</u> <u>denied</u>, 131 Fed. Cl. 528 (2017); <u>Fin. & Realty Servs, LLC v. United States</u>, 128 Fed. Cl. 770, 777 (2016); <u>Kennedy Heights Apartments, Ltd., I v. United States</u>, 48 Fed. Cl. 574, 578 (2001). The United States Court of Appeals for the Federal Circuit has stated that, at the motion to dismiss for failure to state a claim stage of a proceeding, a

> breach of contract claim requires two components: (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty. <u>See</u> <u>Hercules, Inc. v. United States</u>, 24 F.3d 188, 198 (Fed. Cir. 1994); <u>San Carlos Irrigation & Drainage Dist. v. United States</u>, 877 F.2d 957, 959 (Fed. Cir. 1989). In making this assessment, the court must interpret the contract's provisions to ascertain whether the facts plaintiff alleges would, if true, establish a breach of contract. <u>See</u> <u>S. Cal. Edison v. United States</u>, 58 Fed. Cl. 313, 321 (2003) ("Contract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss.") (citing <u>Kennedy Heights Apartments, Ltd., I v. United States</u>, 48 Fed. Cl. 574, 578 (2001)).

<u>Bell/Heery v. United States</u>, 739 F.3d at 1330; <u>see</u> <u>also</u> <u>Fin. & Realty Servs., LLC v. United States</u>, 128 Fed. Cl. at 777 ("Moreover, interpreting a contract is proper at this [motion to dismiss] stage of the proceedings." (citing <u>Varilease Tech. Grp., Inc. v. United States</u>, 289 F.3d 795, 798 (Fed. Cir. 2002); and <u>S. Cal. Edison v. United States</u>, 58 Fed. Cl. at 321)); <u>see</u> <u>also</u> <u>Canpro Invs. Ltd. v. United States</u>, 130 Fed. Cl. at 347 (interpreting a lease when analyzing a motion to dismiss for failure to state a claim under RCFC 12(b)(6)); <u>Solaria Corp. v. United States</u>, 123 Fed. Cl. 105, 115 (2015) (interpreting a document when analyzing a motion to dismiss for failure to state a claim under RCFC 12(b)(6)), <u>aff'd</u>, 671 F. App'x 797 (Fed. Cir. 2016), <u>cert.</u> <u>denied</u>, 137 S. Ct. 1827 (2017). In <u>Bell/Heery v. United States</u>, the United States Court of Appeals for the Federal Circuit applied standard contract interpretation rules, which provide:

> "Contract interpretation begins with the language of the written agreement." <u>Coast Fed. Bank, FSB v. United States</u>, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing <u>Foley Co. v. United States</u>, 11 F.3d 1032, 1034 (Fed. Cir. 1993)). When interpreting a contract, "if the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'" <u>McAbee Const., Inc. v. United States</u>, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting <u>Alaska Lumber & Pulp Co. v. Madigan</u>, 2 F.3d 389, 392 (Fed. Cir. 1993)). A contract must also be construed as a whole and "in a manner that gives meaning to all of its provisions and makes sense." <u>Id.</u> (citing <u>Hughes Commc'ns Galaxy, Inc. v. United States</u>, 998 F.2d 953, 958 (Fed. Cir. 1993)).

<u>Bell/Heery v. United States</u>, 739 F.3d at 1331.

50

Plaintiff's complaint alleges that "Section II.A of the MTW Agreement between HUD and SAHA" provides that "'[t]he amount of assistance received under sections 8 or 9 of the 1937 Act by an Agency participating in the demonstration **shall not be diminished** by the Agency's participation in the MTW demonstration.'" (emphasis in original) (quoting Section II.A of the 2009 MTW Agreement). The complaint also alleges that the government "breached" "Section II.A of the MTW Agreement by reducing SAHA's operating subsidy" inequitably, "solely because SAHA is a MTW agency (specifically through HUD's policy requiring reduction of the operating subsidies of MTW agencies, regardless of whether the agency had excess reserves, while considering the existence of excess reserves in making the same determination for non-MTW agencies)." The complaint further notes that, "[a]s a result of HUD's breach of the MTW Agreement, SAHA was damaged in the amount of at least $2,874,719 and is entitled to recover [the] same." The complaint sufficiently identifies that the government had a contractual duty to not diminish a MTW agency's Section 9 operating subsidy based on the MTW agency's participation in the MTW demonstration. The complaint also identifies that the government breached that duty when the government allegedly decreased plaintiff's Section 9 operating subsidy in 2012 based "solely" on its participation in the MTW demonstration program. In addition, the complaint sufficiently alleges that the government's breach damaged plaintiff in the amount of "$2,874,719." Therefore, plaintiff has plausibly alleged the elements of a breach of contract claim to survive a motion to dismiss for failure to state claim.

Defendant, nonetheless, argues that plaintiff's breach of contract claim fails to state a claim because plaintiff cannot recover damages under the 2009 MTW Agreement but can only recover strings-attached funds, which, according to defendant, is a form of prospective relief. As previously discussed, plaintiff does not seek prospective relief but retrospective monetary relief for its breach of contract claim, asking this court to compensate it for the damage it allegedly incurred when the government allegedly discriminated against plaintiff and inappropriately diminished its Section 9 operating subsidy for 2012. Plaintiff's breach of contract claim is a claim "for money for which the Court of Federal Claims can provide an adequate remedy, and it therefore belongs in [this] court." Suburban Mortg. Assocs., Inc. V. U.S. Dep't of Hous. & Urban Dev., 480 F.3d at 1126. Just as defendant's strings-attached argument failed on defendant's motion to dismiss for lack of subject matter jurisdiction, defendant's strings-attached argument fails to support defendant's motion to dismiss for failure to state a claim.

Defendant then argues that plaintiff's breach of contract claim fails to state a claim because "SAHA cannot be said to have suffered any 'direct damages' as a result of HUD's alleged underpayment" of Section 9 operating subsidies to plaintiff in 2012. (quoting 24 Williston on Contracts § 64:1). According to defendant, HUD's "alleged underpayment could not (and did not) deny SAHA the benefit of its bargain with HUD." (internal quotation marks omitted). To survive a motion to dismiss for failure to state a claim, a plaintiff need only plead a claim for relief that is plausible on its face. See Bell Alt. Corp. v. Twombly, 550 U.S. at 570; see also Cambridge v. United States, 558 F.3d at 1335.

The complaint alleges that pursuant to Section II.A of the 2009 MTW Agreement, the government was prohibited from diminishing plaintiff's Section 9 operating subsidy based solely on plaintiff's participation in the MTW demonstration program. The complaint also alleges that the government breached Section II.A when the government diminished plaintiff's Section 9 operating subsidy for 2012 due to plaintiff's participation in the MTW demonstration program, which resulted in $2,874,719.00 of damages. Therefore, contrary to defendant's position, plaintiff sufficiently has alleged that the government denied it a benefit that was contained in the contract, i.e., the government's promise that it would not diminish plaintiff's Section 9 operating subsidies due to its participation in the MTW demonstration program. Whether plaintiff was actually and directly damaged in the amount of $2,874,719.00 due to the government's alleged violation of Section II.A of the 2009 MTW Agreement is a factual issue to be decided in future proceedings, and on which plaintiff bears the burden of proving. See Northrop Grumman Computing Sys., Inc. v. United States, 823 F.3d 1364, 1368 (Fed. Cir. 2016) ("It is fundamental in contract law that in order to recover on a breach of contract claim, a plaintiff must prove damages— that it has been harmed."). At this motion to dismiss stage for failure to state a claim, this court accepts as true the moving party's factual allegations. See Kam-Almaz v. United States, 682 F.3d at 1367; see also Engage Learning, Inc. v. Salazar, 660 F.3d at 1355. Accordingly, the court denies defendant's motion to dismiss plaintiff's breach of contract claim for failure to state a claim upon which relief may be granted pursuant to RCFC 12(b)(6).

## II.      Count II: Alleged Violation of Section (f) of the MTW Statute.

Defendant seeks to dismiss Count II of the complaint for lack of subject matter jurisdiction because Section (f) of the MTW Statute allegedly is not "money-mandating." Count II alleges a violation of Section (f) of the MTW Statute, the section of the statute which provides that government "shall not" diminish a MTW agency's Section 9 operating subsidy because of the MTW agency's participation in the MTW demonstration program. Defendant argues that Section (f)

> merely states that "[t]he amount of assistance received under section 8, section 9, or pursuant to section 14 by a public housing agency shall not be diminished by its participation [in the MTW demonstration]," MTW Statute § 204(f), and there is no term in the MTW Statute itself that purports to require the payment of money at all.

(alterations in original). Defendant notes that the while Section (f) of the MTW Statute "referenc[es] Sections 8 and 9 of the 1937 Housing Act," those sections "cannot—by incorporation, cross-reference, or otherwise—transform the MTW Statute into a money-mandating source of law." (brackets in original). Defendant also argues that, even if Section 8 and Section 9 of the 1937 Housing Act were relevant, "Section 8 and Section 9 both attach strings to payments made under programs created by those statutes," and, thus, pursuant to Lummi, are not "money-mandating for purposes of the Tucker Act."

Plaintiff argues that Section (f) of the MTW Statute "is but a part of and incorporates into itself the 1937 Housing Act," which, according to plaintiff, is money-mandating. Plaintiff specifically argues that Section 9 of the 1937 Housing Act, which is referenced in Section (f) of the MTW Statute, is money-mandating "because it provides clear standards for paying money to PHAs," and because "the statutorily required implementation regulations for Section 9 under 24 C.F.R. Part 990 are themselves money-mandating sources of law."

This court has jurisdiction over claims against the United States based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. at 289-90; United States v. Mitchell, 463 U.S. at 215; see also Kam-Almaz v. United States, 682 F.3d 1364, 1368 (Fed. Cir. 2012); Greenlee Cnty., Ariz. v. United States, 487 F.3d at 875; Palmer v. United States, 168 F.3d at 1314.

"There are two steps to the inquiry whether a statute is money-mandating." Wilburn v. United States, 103 Fed. Cl. 495, 499 (2011) (citing Samish Indian Nation v. United States, 657 F.3d 1330, 1335-36 (Fed. Cir. 2011), reh'g and reh'g en banc denied (Fed. Cir.), judgment vacated on other grounds, 568 U.S. 936 (2012)). The first step is "to determine whether the law in question imposes 'specific obligations' on the government." Wilburn v. United States, 103 Fed. Cl. at 499 (quoting Samish Indian Nation v. United States, 657 F.3d at 1335). The second step is "'whether the relevant source of substantive law can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes.'" Wilburn v. United States, 103 Fed. Cl. at 499 (quoting Samish Indian Nation v. United States, 657 F.3d at 1335).

The statute "need not *explicitly* provide that the right or duty it creates is enforceable through a suit for damages, but it triggers liability only if it 'can fairly be interpreted as mandating compensation by the Federal Government,'" which has been termed the "fair interpretation" rule and is discussed in more detail below. United States v. Navajo Nation, 556 U.S. at 290 (emphasis in original) (quoting United States v. Testan, 424 U.S. at 400); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Lummi, 870 F.3d at 1317 (noting that a statute is money-mandating if "'it grants the claimant a right to recover damages either expressly or by implication'" (quoting Blueport Co., LLC v. United States, 533 F.3d at 1383 (quoting United States v. Mitchell, 463 U.S. at 216-17))); Ramona Two Shields v. United States, 820 F.3d 1324, 1332 (Fed. Cir. 2016) (noting that for jurisdictional purposes, the court must "determine whether the relevant source of substantive law can be fairly interpreted as a [sic] money-mandating" (citing United States v. Navajo Nation, 556 U.S. at 291)); Roberts v. United States, 745 F.3d 1158, 1162 (Fed. Cir. 2014); Blueport Co., LLC v. United States, 533 F.3d at 1383; Ont. Power Generation, Inc. v. United States, 369 F.3d at 1301 (noting that the "'particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum'" (quoting Eastport S.S. Corp. v. United States, 178 Ct. Cl. at 605-06, 372 F.2d at 1007-08)); Perri v. United States, 340 F.3d 1337, 1342 (Fed. Cir. 2003).

The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290 (noting that the Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)"). "If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction." Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d at 1308 (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d at 1173 (stating that the absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act"); Mitchell v. United States, 136 Fed. Cl. 286, 289 (2018) (dismissing complaint for lack of subject matter jurisdiction when "none of the sources of law mentioned in his complaint is [sic] money-mandating"); Peoples v. United States, 87 Fed. Cl. at 565-66. "Further, the statute and regulations must be money-mandating as to the class[13] of which plaintiff claims to be a member." Roberts v. United States, 745 F.3d at 1162 (citing Casa de Cambio Comdiv S.A. de C.V. v. United States, 291 F.3d 1356, 1361 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 921 (2003)); Hindman v. United States, 130 Fed. Cl. 705, 706 (2017) (noting that if plaintiff could meet certain conditions, plaintiff would be "within the class of plaintiffs entitled to recover under the money-mandating source" (quoting Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d at 1307)).

The "fair interpretation" rule, noted above,

demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity. "Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity." Mitchell II, supra, at 218–219, 103 S. Ct. 2961. It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," [Mitchell II,] 463 U.S., at 218, 103 S. Ct. 2961, a fair inference will do.

United States v. White Mountain Apache Tribe, 537 U.S. at 472-73; see also Holmes v. United States, 657 F.3d at 1309 ("This 'fair interpretation' rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity." (quoting United States v. White Mountain Apache Tribe, 537 U.S. at 472)); C & L Grp., LLC v. United States, 140 Fed. Cl. 750, 753-54 (2018) ("'This "fair interpretation" rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity.'" (quoting Holmes v. United States, 657 F.3d at 1309 (quoting United States v. White Mountain Apache Tribe, 537 U.S. at 472)))).

---

[13] "Class" within this context refers to the type of plaintiff the moving party claims to be, not a "class" within the context of a class action suit.

In addition, statutes that make "'use of the word "'"shall"'"' to require payment of money or damages" are likely to be interpreted as money-mandating. <u>Allen v. United States</u>, 140 Fed. Cl. 550, 562 (2018) (quoting <u>Greenlee Cty. v. United States</u>, 487 F.3d at 877 (quoting <u>Agwiak v. United States</u>, 347 F.3d 1375, 1380 (Fed. Cir. 2003))); <u>Britell v. United States</u>, 372 F.3d 1370, 1378 (Fed. Cir. 2004) ("This and other courts have repeatedly held that this type of mandatory language, e.g., 'will pay' or 'shall pay,' creates the necessary 'money-mandate' for Tucker Act purposes."); <u>Sanford Health Plan v. United States</u>, 139 Fed. Cl. 701, 705 (2018) ("The 'use of the word "'"shall"'"' generally makes a statute money-mandating.'" (quoting <u>Greenlee Cty. v. United States</u>, 487 F.3d at 877 (quoting <u>Agwiak v. United States</u>, 347 F.3d at 1390))), <u>appeal</u> <u>docketed</u>, No. 19-1290 (Fed Cir. Dec. 11, 2018).

For example, in <u>Agwiak v. United States</u>, the Federal Circuit found that 5 U.S.C. § 5942(a) (2000), the statute under which the appellant sought recovery, was money-mandating. <u>See</u> <u>Agwiak v. United States</u>, 347 F.3d at 1379-80. The Federal Circuit in <u>Agwiak</u> explained:

> The relevant statute in this case provides that an employee at a remote duty site "is entitled" to the remote duty allowance. 5 U.S.C. § 5942(a). The statute further provides that "[t]he allowance *shall be paid* under regulations prescribed by the President." <u>Id.</u> (emphasis added). We have repeatedly recognized that the use of the word "shall" generally makes a statute money-mandating. <u>See</u>, <u>e.g.</u>, <u>McBryde v. United States</u>, 299 F.3d 1357, 1361 (Fed. Cir. 2002); <u>Huston v. United States</u>, 956 F.2d 259, 261-62 (Fed. Cir. 1992); <u>Grav v. United States</u>, 886 F.2d 1305, 1307 (Fed. Cir. 1989). Indeed, we have held that 37 U.S.C. § 204 is money-mandating, and it contains substantively identical language to the statute at issue here: "The following persons *are entitled* to the basic pay of the pay grade to which assigned or distributed," 37 U.S.C. § 204(a) (2000) (emphasis added). <u>See</u>, <u>e.g.</u>, <u>Martinez</u>, 333 F.3d at 1303 (acknowledging that 37 U.S.C. § 204 is money-mandating); <u>Holley v. United States</u>, 124 F.3d 1462, 1465 (Fed.Cir.1997 [sic]) ("It is well established that 37 U.S.C. § 204 ('Pay and Allowances of the Uniformed Services') serves as the money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge.").
>
> Moreover, the implementing regulations for section 5942(a) contain similar language. <u>See</u> 5 C.F.R. § 591.304(a) (2003) (requiring that "a duty post shall be determined to be a remote duty post" when certain criteria are satisfied); 5 C.F.R. § 591.306(a) (2003) (requiring that remote duty pay "shall be paid to each employee with a permanent duty station at or within a remote post of duty approved under § 591.304"). We therefore hold that 5 U.S.C. § 5942(a) and its implementing regulations are money-mandating.

<u>Agwiak v. United States</u>, 347 F.3d at 1380.

By further example, in <u>ARRA Energy Co. I v. United States</u>, 97 Fed. Cl. 12 (2011), a Judge of this court determined that "section 1603 of the American Recovery and Reinvestment Tax Act of 2009, Pub. L. No. 111–5, Div. B., tit. I, § 1603, 123 Stat. 115, 364 (Recovery Act)" could be fairly interpreted as money-mandating. <u>See ARRA Energy Co. I. v. United States</u>, 97 Fed. Cl. at 14. Section 1603 of the Recovery Act provided, "'[u]pon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b).'" <u>ARRA Energy Co. I. v. United States</u>, 97 Fed. Cl. at 14-15 (brackets in original) (quoting Section 1603 of the Recovery Act). The <u>ARRA Energy Co. I.</u> court found that Section 1603 could be fairly interpreted as money-mandating, even though it did not contain an "express damages remedy for its violation," because Section 1603 "compels the payment of money by the government and does not provide the government with any discretion to refuse such payments when the specific requirements of the statute are met." <u>See ARRA Energy Co. I. v. United States</u>, 97 Fed. Cl. at 19-20.

In addition, a "statute is not money-mandating when it gives the government complete discretion over the decision whether or not to pay an individual or group." <u>Doe v. United States</u>, 463 F.3d 1314, 1324 (Fed. Cir. 2006) (citing <u>Doe v. United States</u>, 100 F.3d 1576, 1582 (Fed. Cir. 1996); and <u>McBryde v. United States</u>, 299 F.3d 1357, 1362 (Fed. Cir. 2002)), <u>cert. denied</u>, 549 U.S. 1321 (2007); <u>see also Roberts v. United States</u>, 745 F.3d at 1163-64; <u>Wolfchild v. United States</u>, 731 F.3d 1280, 1292 (Fed. Cir. 2013) ("We have long recognized that statutes granting officials 'substantial discretion' are 'not considered money-mandating . . . .'" (quoting <u>Price v. Panetta</u>, 674 F.3d 1335, 1339 (Fed. Cir. 2012))), <u>cert. denied</u>, 572 U.S. 1009 (2014); <u>Barnick v. United States</u>, 591 F.3d 1372, 1378 (Fed. Cir. 2010). In certain instances, statutes under which the government retains some amount of discretion may be money-mandating if the statutes "provide 'clear standards for paying' money to recipients; (2) that state the 'precise amounts' that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions." <u>Samish Indian Nation v. United States</u>, 419 F.3d at 1364 (quoting <u>Perri v. United States</u>, 340 F.3d at 1342-43); <u>see also Samish Indian Nation v. United States</u>, 657 F.3d at 1336; <u>Allen v. United States</u>, 140 Fed. Cl. at 563.

The issue currently before the court is whether Section (f) of the MTW Statute, the section of the statute that plaintiff claims the government violated when the government reduced plaintiff's Section 9 operating subsidy for 2012, is money-mandating. The MTW Statute, as previously noted, was enacted as part of the Omnibus Consolidated Recessions and Appropriations Act for 1996, the appropriations act which appropriated monies for HUD's various programs for fiscal year 1996. The MTW Statute created the MTW demonstration program and provided "AUTHORITY" to the "Secretary of Housing and Urban Development" to "conduct" the MTW demonstration program. <u>See</u> MTW Statute, § 204(b) (capitalization in original).

Section (f), the provision of the MTW Statute at issue in this case, states: "EFFECT ON SECTION 8, OPERATING SUBSIDIES, AND COMPREHENSIVE GRANT PROGRAM ALLOCATIONS.—The amount of assistance received under section 8,

section 9, or pursuant to section 14 by a public housing agency participating in the demonstration under this part shall not be diminished by its participation." Id. at § 204(f) (capitalization in original). Defendant argues that Section (f) of the MTW Statute is not a money-mandating statute because it does not contain any "term" that "purports to require the payment of money at all." As previously noted, however, a statute need not "explicitly provide that the right or duty it creates is enforceable through a suit for damages." United States v. Navajo Nation, 556 U.S. at 290. Instead, the statute (1) must provide "specific obligations on the Government," and (2) be "fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties" imposed. Samish Indian Nation v. United States, 657 F.3d at 1335. Section (f) of the MTW Statute imposes a "specific obligation on the Government" because Section (f) of the MTW Statute states that federal funding received by a MTW agency "shall not be diminished" by the government because of the MTW agency's participation in the MTW demonstration program. (emphasis added). The Federal Circuit in Hatter v. United States, 953 F.2d 626 (Fed. Cir. 1992), determined that when a provision of law imposes a duty on the government not to diminish a party's compensation, the provision can fairly be interpreted to provide monetary damages "in the event of a prohibited compensation diminution." Hatter v. United States, 953 F.2d 626, 628 (Fed. Cir. 1992). In Hatter, life-tenured federal Judges brought suit in the United States Claims Court, alleging the government wrongfully diminished their salaries in violation of the compensation clause contained within Article III, Section I of the United States Constitution, which provides that, "'[t]he Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.'" Id. at 628 (capitalization in original) (quoting U.S. Const., art. III, § 1). The Federal Circuit in Hatter found that the Judges' claim for wrongful diminution of their salaries fell within the jurisdiction of the Tucker Act because Article III, Section 1 was a money-mandating source of law. Id. According to the Hatter court:

> This provision of the Constitution, fairly interpreted, mandates the payment of money in the event of a prohibited compensation diminution. This provision states, in mandatory and unconditional terms, that judges' salaries "shall not be diminished during their Continuance in Office." This language presupposes damages as the remedy for a governmental act violating the compensation clause. Only a timely restoration of lost compensation would prevent violation of the Constitution's prohibition against diminution of judicial salaries.

> Thus, the Constitution mandates that federal judges must receive, "during their Continuance in Office," compensation for their services which may not be less than their compensation upon assuming office. In the event of a violation of this clause, the Constitution itself provides a remedy— compensation. In sum, by forbidding any diminution of judicial compensation, the Constitution itself requires repayment of prohibited reductions in compensation to Article III judicial officers.

Id. The Hatter court, therefore, indicated that the "shall not be diminished" language "presuppose[d] damages" as a remedy in the event that the "shall not be diminished" language was violated, and that the "shall not be diminished" language "itself provides a remedy—compensation." See id.

Although Section (f) of the MTW Statute, the statute at issue in this case, does not relate to federal judges' salaries or to the United States Constitution, the reasoning of Hatter can be extended to the facts of this case. Section (f) of the MTW Statute, like Article III, Section 1 of the Constitution at issue in Hatter, prohibits the government from improperly diminishing federal funding provided to a specific group. As previously noted, Section (f) of the MTW Statute states that the "assistance" received by a public housing agency, such as SAHA, pursuant to "section 8, section 9" and "section 14" of the 1937 Housing Act "shall not be diminished by its participation." Section 8, Section 9, and Section 14 of the 1937 Housing Act, in turn, each provide that a public housing agency is to receive various forms of federal funding, such as grants and subsidies, in exchange for the public housing agency's provision of affordable housing opportunities to families and individuals. See, e.g., 42 U.S.C. §§ 1437f, 1437g. Therefore, like Article III's money-mandating statement that Judges' salaries "shall not be diminished," Section (f)'s statement that a public housing agency's assistance "shall not be diminished by its participation" "presupposes damages as the remedy for a governmental act violating" Section (f)'s requirements. See Hatter v. United States, 953 F.2d at 628.

Further, as the Hatter court reasoned, the availability of damages within the context of an anti-diminishing provision allows for a "timely restoration of lost compensation" and would "prevent" further government "violation[s]" of the anti-diminishing provision. See id. As previously discussed, pursuant to the MTW Statute:

> The purpose of this demonstration is to give public housing agencies and the Secretary of Housing and Urban Development the flexibility to design and test various approaches for providing and administering housing assistance that: reduce cost and achieve greater cost effectiveness in Federal expenditures; give incentives to families with children where the head of household is working, seeking work, or is preparing for work by participating in job training, educational programs, or programs that assist people to obtain employment and become economically self-sufficient; and increase housing choices for low-income families.

MTW Statute, § 204(a) (capitalization in original). If the government was able to diminish a MTW agency's federal funding due solely to the agency's participation in the MTW demonstration program, there would be little incentive for the MTW agency to continue participating in the MTW demonstration program.

Defendant also argues that Section (f) of the MTW Statute cannot be fairly interpreted as money-mandating because Section (f) does not provide public housing agencies with "*compensatory*" monies but with monies which come with "strings attached," such as the "require[ment] to spend that money to carry out Federal housing

policies and objectives, and for the benefits of others, as prescribed by Congress and HUD." (emphasis in original). Defendant argues that statutes which provide a party with "strings-attached" funds cannot be considered money-mandating pursuant to the Federal Circuit's recent holding in Lummi.

As previously noted, in Lummi, the Federal Circuit found that NAHASDA, a statutory program which provided federal housing founding to Indian tribes was not money-mandating. NAHASDA provided for

> an annual block grant system, whereby Indian tribes receive direct funding in order to provide affordable housing to their members. The relevant sections of NAHASDA require HUD to make grants according to a regulatory formula based on several factors, including: (1) "[t]he number of low-income housing dwelling units . . . owned or operated" by the tribes on NAHASDA's effective date; (2) the number of Indian families and extent of poverty and economic distress within a tribe's area; and (3) "[o]ther objectively measurable conditions as [HUD] and the Indian tribes may specify." Id. § 4152(b)(1)–(3).
>
> The dwelling units described in factor (1) are called Formula Current Assisted Stock ("FCAS"). Each eligible dwelling unit in a tribe's FCAS is entitled to a sum certain amount of funding each year based upon a calculated operating subsidy and modernization allocation. HUD regulations establish which units initially count as FCAS in the formula, and when those units no longer qualify (e.g., when they have been or could have been conveyed to homebuyers). 24 C.F.R. §§ 1000.312, 1000.314, 1000.318. Once awarded these subsidies, grantee tribes are limited in how and when they may dispense the funds, which can be used only on statutorily specified activities in accordance with program requirements. See, e.g., 25 U.S.C. § 4139; 2 C.F.R. § 200.313–314.

Lummi, 870 F.3d at 1315 (brackets and omission in original). As the Lummi court explained, HUD had determined, based on a 2001 HUD Inspector General report, that HUD had miscalculated the amount of funding that the appellees were entitled to receive "because the formula that HUD had applied had including housing that did not qualify as FCAS," resulting in an overpayment of funds to appellees. See Lummi, 879 F.3d at 1315-16. HUD "recouped the excess funding by deducting the amount overfunded from subsequent grant allocations—$863,236 from Lummi, $249,689 from Fort Berthold, and $964,699 from Hopi." Id. at 1316. Following HUD's recoupment of overpaid grant monies, the Lummi appellees brought suit in the United States Court of Federal Claims, "alleging that HUD improperly deprived them of grant funds to which they were entitled," and, in particular, that "HUD misapplied the NAHASDA formula by inappropriately removing housing units from the FCAS data, which led to decreased grant amount." Id. The Court of Federal Claims found that NAHASDA was money-mandating. See Lummi Tribe of Lummi Reservation, et al., v. United States, 99 Fed. Cl. 584, 597 (2011).

On appeal, the Federal Circuit stated that:

Under NAHASDA, the Tribes are not entitled to an actual payment of money damages, in the strictest terms; their only alleged harm is having been allocated too little in grant funding. Thus, at best, the Tribes seek a nominally greater strings-attached disbursement. But any monies so disbursed could still be later reduced or clawed back. See 25 U.S.C. § 4161(a)(1). And any property acquired with said monies would be "held in trust" by the Tribes, "as trustee for the beneficiaries" of NAHASDA. 2 C.F.R. § 200.316; see generally 24 C.F.R. §§ 85.1, 1000.26. The Tribes are even restricted with respect to the particular bidding and bond terms they may use for, say, housing construction contracts. See 2 C.F.R. § 200.325; 24 C.F.R. § 1000.26.

To label the disbursement of funds so thoroughly scrutinized and cabined as a remedy for "damages" would strain the meaning of the term to its breaking point.

Lummi, 870 F.3d at 1318.

The Federal Circuit in Lummi concluded that:

Here, the underlying claim is not for presently due money damages. It is for larger strings-attached NAHASDA grants—including subsequent supervision and adjustment—and, hence, for equitable relief. Indeed, *any* such claim for relief under NAHASDA would necessarily be styled in the same fashion; the statute does not authorize a free and clear transfer of money. Accordingly, the Claims Court erred in finding NAHASDA to be money mandating.

Id. at 1319 (emphasis in original).

NAHASDA, the statute at issue in Lummi, however, did not include a separate provision which affirmatively prohibited the government from diminishing a tribe's annual grant amounts, unlike Section (f) of the MTW Statute at issue in this case. Thus, the Lummi court did not engage in any analysis of whether an anti-diminishing obligation imposed on the government can be fairly interpreted as mandating monetary damages in the event of a wrongful diminishment. Further, the Lummi appellees' "underlying claim" was a request for a "disbursement" of "larger strings-attached NAHASDA grants," which the Federal Circuit deemed was not a claim for "presently due money damages," but for "equitable relief." As previously noted, the plaintiff in this case does not seek the disbursement of Section 9 operating subsidies, the subsidy that plaintiff claims the government wrongfully diminished in 2012. Instead, plaintiff seeks to be compensated for the government's violation of its duty to not discriminatorily diminish plaintiff's Section 9 operating subsidy in 2012. Although the funds at issue in both Lummi and this case relate to federal housing funding, plaintiff is seeking a retroactive monetary award, which would

not come with statutorily attached strings, such as "subsequent supervision and adjustment" by HUD. Thus, <u>Lummi</u> does not assist the court in resolving the issue currently before the court, which is whether a statutory anti-diminishing provision could fairly be interpreted as providing monetary damages. In sum, contrary to defendant's position, Section (f) of the MTW Statute can be fairly interpreted as money-mandating, and is within this court's jurisdiction. Defendant's motion to dismiss plaintiff's Count II for lack of subject matter jurisdiction is denied.

In addition to seeking to dismiss Count II for lack of subject matter jurisdiction, defendant also argues, in a conclusory fashion, and in only two sentences of its motion to dismiss, that Count II fails to state a claim pursuant to RCFC 12(b)(1). Defendant argues, "to the extent that SAHA seeks a money judgment without the strings attached, SAHA requests relief to which it is not entitled under any law or contract with HUD, let alone the MTW Statute." Defendant then states that, for this reason, "the Court should dismiss SAHA's claim[] pursuant to RCFC 12(b)(6)."

As previously noted, to survive a motion to dismiss, the plaintiff need only present a "short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555. Count II of plaintiff's complaint alleges that:

> Section (f) of the MTW Act prohibits the reduction of a MTW agency's operating subsidy on the basis of the agency's participation in the MTW program. HUD violated Section (f) by reducing SAHA's operating subsidy in the manner set forth above solely because SAHA is a MTW agency (specifically through HUD's policy requiring reduction of the operating subsidies of MTW agencies, regardless of whether the agency had excess reserves, while considering the existence of excess reserves in making the same determination for non-MTW agencies).

Count II also alleges that, due to "HUD's violation of the MTW Act, SAHA was damaged in the amount of at least $2,874,719.00 and is entitled to recover [the] same." Count II, thus, sufficiently pleads that Section (f) of the MTW Statute imposes an obligation on the government to not unduly diminish a MTW agency's subsidy on the basis of participation in the MTW program and that the government violated this obligation when it diminished plaintiff's Section 9 operating subsidy. Further, contrary to defendant's argument that plaintiff seeks to recover strings-attached funds under Count II, plaintiff does not seek prospective relief but retrospective monetary relief for its statutory claim brought pursuant to Section (f) of the MTW Statute. As previously discussed, plaintiff is asking this court to compensate it in the amount of "$2,874,719.00" for the damage it incurred when the government allegedly inappropriately diminished plaintiff's Section 9 operating subsidy for 2012. Just as defendant's strings-attached argument failed on defendant's motion to dismiss for lack of subject matter jurisdiction Count II, defendant's strings-attached argument fails to support defendant's motion to dismiss for failure to state a claim. Defendant's motion to dismiss Count II for failure to state a claim is denied.

### III.    Count III: Alleged Violation of the 2012 Appropriations Act.

Defendant also seeks to dismiss for lack of subject matter jurisdiction Count III, plaintiff's statutory claim based on the 2012 Appropriations Act. As previously discussed, Count III alleges that defendant violated the 2012 Appropriations Act when defendant diminished plaintiff's Section 9 operating subsidy in 2012. Defendant argues in its motion to dismiss that:

> Although the statute generally deals with funding, it affords the Government discretion to allocate that funding among potential recipients "as determined by the Secretary." 2012 Appropriations Act, 125 Stat. at 680. The 2012 Appropriations Act did not provide "clear standards" for paying money to PHAs, nor state the "precise amounts" payable to them, nor compel payment upon "satisfaction of [any] conditions." Samish [Indian Nation v. United States], 657 F.3d at 1335.

Therefore, according to defendant, the 2012 Appropriations Act at issue is "not money-mandating."

Defendant further argues in its reply in support of its motion to dismiss that "even if SAHA were right that [t]he 2012 Appropriations Act requir[ed] that HUD pay PHAs a specific amount of money according to certain criteria, the very nature of that Section 9 money could not support a Tucker Act claim." (alterations in the original) (internal reference and quotation marks omitted). According to defendant, Section 9 operating subsidies are "not *compensatory*," and instead are monies that plaintiff is "required to spend" in order to carry out Federal housing policies and objectives, and for the benefit of others, as prescribed by Congress and HUD. (emphasis in original). In addition, defendant argues that Section 9 operating subsidies "can be used solely for the purposes authorized by statute, regulation and agreement, and" are "subject to extensive agency supervision and the agency's right of recapture." Defendant argues that plaintiff, therefore, is not entitled to an award of damages stemming from the government's handling of such highly regulated funds pursuant to the Federal Circuit's holding in Lummi.

Plaintiff argues in its response to defendant's motion to dismiss that the "2012 Appropriations Act is money-mandating." Plaintiff argues that the 2012 Appropriations Act, contrary to defendant's position, does not afford defendant with discretion to allocate Section 9 operating subsidies "but rather provides guidance in how to calculate the amounts." Plaintiff argues that "[t]he 2012 Appropriations Act provides unmistakably that PHAs, including SAHA, are to receive $3,961,850,000 in operating subsidies for 2012 under the 1937 Housing Act," and that "[t]he 2012 Appropriations Act contains other provisos and requirements under which the HUD Secretary 'shall' act." (quoting 2012 Appropriations Act, 125 Stat. at 680). According to plaintiff, the 2012 Appropriations Act requires "that HUD pay PHAs a specific amount of money according to certain criteria,"

and, "thus meets the qualifications of a money-mandating statute." (citing <u>Samish Indian Nation v. United States</u>, 657 F.3d at 1336).

The relevant provision of the 2012 Appropriations Act states:

PUBLIC HOUSING OPERATING FUND

For 2012 payments to public housing agencies for the operation and management of public housing, as authorized by section 9(e) of the United States Housing Act of 1937 (42 U.S.C. § 1437g(e)), $3,961,850,000, of which $20,000,000 shall be available until September 30, 2013: *Provided,* That in determining public housing agencies', including Moving to Work agencies', calendar year 2012 funding allocations under this heading, the Secretary shall take into account public housing agencies' excess operating fund reserves, as determined by the Secretary: *Provided further*, That Moving to Work agencies shall receive a pro-rata reduction consistent with their peer groups: *Provided further*, That no public housing agency shall be left with less than $100,000 in operating reserves: *Provided further*, That the Secretary shall not offset excess reserves by more than $750,000,000 . . . *Provided further*, That of the amount provided under this heading up to $20,000,000 may be set aside to provide assistance to any public housing authority who encounters financial hardship as a direct result of an excess reserve offset applied to an allocation of funding under this heading: *Provided further*, That the Secretary shall provide flexibility to public housing agencies to use excess operating reserves for capital improvements.

2012 Appropriations Act, 125 Stat. at 680 (emphasis in original). Although the 2012 Appropriations Act appropriates "$3,961,850,000" for Section 9 operating subsidies, there is no language in the relevant portion of the 2012 Appropriations Act that mandates HUD to spend that amount of money within 2012. Instead, the 2012 Appropriations Act simply makes "$3,961,850,000" available for HUD's use for 2012. The 2012 Appropriations Act further provides that HUD, when determining 2012 funding allocations, (1) "shall take into account public housing agencies' excess operating fund reserves," (2) provide MTW agencies with a "pro-rata reduction consistent with their peer groups," (3) leave no public housing agency with less than "$100,000 in operating reserves," and (4) shall not offset public housing agencies' reserves "by more than $750,000,000."

Appropriation acts, by their very nature, are generally money-authorizing, not money-mandating. "Appropriations" are a form of "[a]uthority provided by federal law" to "incur obligations and to make payments from the Treasury for specified purposes." <u>GAO Glossary</u> at 20-21. An "appropriation act is the most common means of providing appropriations." <u>Id.</u> at 21. An "Appropriation Act" "generally provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes." <u>Id.</u> at 13. "Appropriations," however, "do not represent cash actually set aside in the Treasury for purposes specified in the appropriation act; they represent amounts that agencies may obligate during the period of time specified in the respective

appropriation acts." Id. at 21. Thus, an appropriation act gives the federal government authority to spend up to a certain amount appropriated in the act but does not necessarily dictate that the government must spend the amount appropriated. The 2012 Appropriations Act at issue in the above-captioned case authorizes the government to spend "[f]or 2012 payments to public housing agencies for the operation and management of public housing, as authorized by section 9(e) of the United States Housing Act of 1937 (42 U.S.C. [§] 1437g(e)), $3,961,850,000." The 2012 Appropriations Act, however, does not contain language stating that the government must spend $3,961,850,000.00 on Section 9 operating subsidies. Therefore, contrary to plaintiff's position, the 2012 Appropriations Act is not-money mandating.

In addition, as the Federal Circuit explained in Perri, an appropriations statute may be "money-authorizing" but not "money-mandating." See Perri v. United States, 340 F.3d at 1341. In Perri, the statute at 28 U.S.C. § 524, titled "Availability of appropriations," was at issue, and which established a "'special fund to be known as the Department of Justice Assets Forfeiture Fund,'" which "'shall be available to the Attorney General without fiscal year limitations,'" to make payments for specified purposes, including "'the payment of awards for information or assistance directly relating to violations of the criminal drug laws of the United States or of sections 1956 and 1957 of title 18, section 5313 and 5324 of title 31, and section 6050I of the Internal Revenue Code of 1986.'" Id. (quoting 28 U.S.C. § 524(c)(1)(B)). The Perri court found that the statute was not "money-mandating" but "money-authorizing" because the statute "authorized," but did not require, the Attorney General to make certain payments. See id. at 1342. The Perri court also noted that the statute

provides no standards for determining "payment of awards for information or assistance directly relating to violations of the criminal drug laws of the United States." 28 U.S.C. § 524(c)(1)(B). Moreover, it does not specify the amount to be paid or the basis for determining such amount. As Eastport noted, "the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." 372 F.2d at 1007 (citations omitted).

Perri v. United States, 340 F.3d at 1342. The Perri court, therefore, held that the United States Court of Federal Claims did not have jurisdiction over appellant's claim brought under 28 U.S.C. § 524(c)(1)(B). See id. at 1344. In this case, the 2012 Appropriations Act, like the statute at issue in Perri, is an appropriations statute which provided the government with funds to spend on certain programs without requiring the government to make a set payment to any specific housing public agency or set the specific conditions to do so. The 2012 Appropriations Act, therefore, is money-authorizing, not money-mandating.

Even if the 2012 Appropriations Act mandated that HUD provide the full amount of $3,961,850,000.00 to public housing agencies, the 2012 Appropriations Act provides the government with broad discretion with no clear standards governing payment, and, therefore, cannot be considered money-mandating. When a statute affords the

government discretion, the statute must provide (1) "clear standards for paying money to recipients," (2) "the precise amounts that must be paid," or (3) as interpreted, compels "payment on satisfaction of certain conditions" in order to be money-mandating. Samish Indian Nation v. United States, 419 F.3d at 1364 (internal quotation marks omitted); see also Samish Indian Nation v. United States, 657 F.3d at 1336. The 2012 Appropriations Act, however, provides no "clear standards" when paying Section 9 operating subsidies, nor does the 2012 Appropriations Act compel "payment on satisfaction of certain conditions" of Section 9 operating subsidies. See Samish Indian Nation v. United States, 419 F.3d at 1364. Although the 2012 Appropriations Act notes that "$3,961,850,000" has been set aside for Section 9 operating subsidies, the 2012 Appropriations Act does not specify "precise amounts" of Section 9 operating subsidies each public housing agency would be entitled to receive in 2012. See id. Because the 2012 Appropriations Act does not meet any of these three conditions, the 2012 Appropriations Act falls outside of this court's jurisdiction. Defendant's motion to dismiss Count III[14] for lack of subject matter jurisdiction is granted.[15]

## CONCLUSION

For the reasons explained above, defendant's motion to dismiss plaintiff's three count complaint for lack of subject matter jurisdiction is **GRANTED IN PART** and **DENIED IN PART**. This court has jurisdiction over Count I, plaintiff's breach of contract claim, and

---

[14] Defendant also sought to dismiss Count III of the complaint for failure to state a claim pursuant to RCFC 12(b)(6) "if the Court does not first dismiss this suit for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1)." Because the court finds that it lacks jurisdiction over Count III of the complaint, defendant's request to dismiss Count III for failure to state a claim is moot.

[15] Moreover, at least one other Judge of this court has determined that the relevant section of the 2012 Appropriations Act "cannot be construed as a money-mandating statute for Tucker Act purposes." Hous. Auth. of City of New Haven v. United States, 140 Fed. Cl. at 789. The Judge in Housing Authority of City of New Haven stated:

> The 2012 Appropriations Act provides HUD with discretion in the distributions of funds because even though HUD was required to "take into account" each public housing authority's excess operating fund reserves, those excess reserves were to be determined by HUD. Moreover, the requirement that HUD simply "take into account" excess reserves, even when coupled with the provision that no public housing authority be left with less than $100,000 in operating reserves and the $750 million aggregate cap on allocation adjustments, is a far cry from a clear standard. Nor does the 2012 Appropriations Act specify discrete amounts to be paid to any particular public housing authority for 2012 or compel payment upon the fulfillment of certain conditions.

Hous. Auth. of City of New Haven v. United States, 140 Fed. Cl. at 788-89.

Count II, plaintiff's statutory claim brought pursuant to Section (f) of the MTW Statute. The court, however, does not have jurisdiction over Count III, plaintiff's statutory claim brought pursuant to the 2012 Appropriations Act, which is dismissed for lack of subject jurisdiction.[16] In addition, defendant's motion to dismiss plaintiff's three count complaint for failure to state a claim is **DENIED**.

      **IT IS SO ORDERED.**

s/ Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[16] Plaintiff requested in its response to the government's motion to dismiss that this court order a transfer "over all or part of" its claims which fall outside of this court's jurisdiction to the United States District Court for the Western District of Texas. Pursuant to RCFC 7(b)(1) (2018), "[a] request for a court order must be made by motion." Plaintiff has not filed a motion to transfer the above-captioned case, and, thus, the court does not address the plaintiff's transfer request improperly embedded within its response brief.